[Crim. No. 12248. First Dist., Div. One. Oct. 21, 1974.]

THE PEOPLE, Plaintiff and Respondent, v.
RONALD JAMES KIRK, Defendant and Appellant.

## COUNSEL

Sam L. Foster for Defendant and Appellant.

Evelle J. Younger, Attorney General, Jack R. Winkler, Chief Assistant Attorney General, Edward P. O'Brien, Assistant Attorney General, Derald E. Granberg and Clifford K. Thompson, Jr., Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**ELKINGTON, J.**—On a jury's verdicts defendant Kirk was found guilty of grand theft (Pen. Code, §§ 484, 487) from the Bank of America, and of four interrelated offenses against the Vigilant Insurance Company, i.e., grand theft, presentation of a false insurance claim (Ins. Code, § 556), willfully secreting property with intent to defraud its insurer (Pen. Code, § 548), and falsely reporting a felony (Pen. Code, § 148.5). He has appealed from an order thereafter placing him on probation for those offenses.

Excluding all that claimed by Kirk to be tainted with error, the evidence of the trial rather conclusively establishes the following.

Kirk purchased seventeen $100 traveler's checks from the Bank of America. Four days later, falsely claiming that the checks had been stolen from his automobile, he applied for and received a refund of $1,700 from the bank. He thereafter cashed all or nearly all of the "stolen" traveler's checks, keeping the proceeds as well as the refund he had received. (This was the subject of the Bank of America grand theft conviction.)

Kirk paid for and was issued a $5,000 "tenant's personal property insurance policy" of the Vigilant Insurance Company. He thereafter falsely reported to police and the insurance company a burglary of his home, claiming a loss of $6,299.01. The insurance company paid off to Kirk in the full amount of its policy. (This was the subject of Kirk's remaining convictions.)

I. Kirk presents his first appellate contention in this manner: "Was the residence of appellant illegally searched, and admission into evidence of one camera, two Huffey bicycles, one Susiki guitar, and one Smith Corona portable typewriter improper?" He, of course, argues that the search was improper.

A magistrate had issued a warrant for the arrest of Kirk, who was thereafter taken into custody at his home. Following the arrest Kirk gave his consent to the search at issue. It seems conceded that had the arrest been valid so also would the consent to search, and the search, have been valid. The trial court found, we think properly, that the magistrate had issued the arrest warrant upon an insufficient showing of probable cause. But the court, also finding, among other things, "that the consent given was in no way connected with any arrest that took place or influenced by any arrest that took place," admitted the questioned evidence.

Kirk relies upon the rule stated in *People* v. *Johnson,* 68 Cal.2d 629, 632

[68 Cal.Rptr. 441, 440 P.2d 921], as follows: " 'A search and seizure made pursuant to consent secured immediately following an illegal entry or arrest . . . is inextricably bound up with the illegal conduct and cannot be segregated therefrom.' . . ."

*People* v. *Johnson* is reasonably to be distinguished from the case at bench. That case concerned *warrantless* police activity without probable cause, followed by a purported "consent" and discovery of contraband. Here the police properly proffered their "evidence" of probable cause for consideration by a magistrate, who erroneously thereon issued the arrest warrant.

■ The rule excluding evidence obtained by unconstitutional means was developed to deter *unlawful* police conduct. It has no reasonable application where police officers in good faith submit the question of whether they have probable cause for judicial evaluation. In *United States* v. *Calandra,* 414 U.S. 338, 347-348 [38 L.Ed.2d 561, 571, 94 S.Ct. 613], the court stated: "The purpose of the exclusionary rule is not to redress the injury to the privacy of the search victim: . . . Instead, the rule's prime purpose is to deter future unlawful police conduct and thereby effectuate the guarantee of the Fourth Amendment against unreasonable search and seizures: . . . In sum, the rule is a judicially created remedy designed to safeguard Fourth Amendment rights generally through its deterrent effect, rather than a personal constitutional right of the party aggrieved." (And see generally the related discussion of Justice (later Chief Justice) Traynor, in *People* v. *Cahan,* 44 Cal.2d 434 [282 P.2d 905, 50 A.L.R.2d 513].) It is doubtful whether the rule of *People* v. *Johnson* is applicable to the factual context of the case before us.

■ But there are other reasons why the search in question must be upheld.

The trial court found that although the information presented to the magistrate fell short of probable cause for Kirk's arrest, the totality of information known to the police did in fact constitute such probable cause. They knew of Kirk's purchase of $1,700 worth of Bank of America traveler's checks, of his report that they had been stolen and of his application for and receipt of a refund, and of an opinion of a handwriting expert that endorsements of the "stolen" traveler's checks were in Kirk's handwriting, indicating that they had been cashed by him.

The trial court made the following observation: "The court has had a considerable period of time to ponder and review in its own mind the evi-

dence presented in this case. The primary question is whether or not the defendant consented and whether that consent was in fact free and voluntary, and subordinate to that, whether or not the consent was in submission to any implied authority. The court finds it was not. The court finds that there was consent in this case; that that consent was free and voluntary; that it was not given in submission to any authority, implied or otherwise. The court finds that the arrest itself was upon probable cause. There may be serious questions about the validity of the arrest warrant and the facts set forth in the affidavit in support of that warrant. *But there were other facts, the evidence discloses, that gave the officers reasonable and probable cause to effect an arrest even without the warrant.*" (Italics added.)

The accepted rule upon which the trial court relied is stated in *People* v. *Rice,* 10 Cal.App.3d 730, 737 [89 Cal.Rptr. 200], in this manner: "[E]ven though an arrest has been made on a constitutionally invalid warrant, the arrest and incident search may nevertheless be justified if the arrest is not based exclusively upon the warrant but if other facts were present at the time of the arrest which furnished probable cause to arrest without a warrant." Other cases asserting or relying on the same rule are: *Chimel* v. *California,* 395 U.S. 752 [23 L.Ed.2d 685, 89 S.Ct. 2034]; *Giordenello* v. *United States,* 357 U.S. 480, 487-488 [2 L.Ed.2d 1503, 1510-1511, 78 S.Ct. 1245]; *People* v. *Groves,* 71 Cal.2d 1196, 1198-1199 [80 Cal.Rptr. 745, 458 P.2d 985]; *People* v. *Chimel,* 68 Cal.2d 436, 440-441 [67 Cal. Rptr. 421, 439 P.2d 333] [overruled on other grounds, *Chimel* v. *California, supra,* 395 U.S. 752]; *People* v. *Donovan,* 272 Cal.App.2d 413, 419 [77 Cal.Rptr. 285]; *People* v. *Sanford,* 265 Cal.App.2d 960, 966 [71 Cal. Rptr. 790].

No error is seen in the trial court's rulings relating to the instant issue.

II. Kirk next contends that the trial court should have granted his motion for "a mistrial when the tape recordings of alleged admissions of appellant were lost or destroyed during the trial."

For some reason Kirk had delivered to a friend a "cassette tape letter" in which he apparently spoke, among other things, of his criminal plans. Over objection the prosecutor was permitted to play two brief portions of the tape in his opening jury statement.

This first of these follows: ". . . I called my parents . . . (not intelligible to this reporter). Hide over in Santa Cruz for awhile. Be at peace. Anyway, I'm going to see what we can do. But I'll stay in touch with you through Mary. And take care of yourself. Remember all the stuff I told

you. Don't say anything about me—you and I being together in Hawaii. Keep that to yourself. Okay. Take care. Bye-bye."

The second portion of the tape played to the jury recited: "And I'll try to get some of these loans and to get this house going and start investing and then building to eventually commercial property, and so forth and so on. But, anyway, we'll work something out. We'll make some money through the insurance companies periodically on claims and stuff like tenant policies up to five thousand, . . . (word not intelligible to this reporter) cameras, stereos, jazz like that. Don't worry about the credit card thing. I don't think we should fool with that. The thing is —"

Thereafter, before the tape could be introduced in evidence it, and a similar one, had mysteriously disappeared from a courtroom table during a noon recess. The matter was called to the court's attention.

Later a juror, observing the absence of the tapes inquired of the court whether they would be played before the jury, and asked, "If not, why not?" ▮▮▮ The court thereafter stated: "Ladies and gentlemen, the court will try to explain something to you. As you are all aware, references have been made to tapes. You have seen tapes that were on the counsel table during the course of the trial up until yesterday. During the lunch hour yesterday, the tapes have for some reason disappeared. And the tapes were not in custody of the prosecution; they're not in custody of the defense; they're technically in the custody of the court. And what I wanted to caution you about is it's not, as far as the court is concerned, any fault of the prosecution or the fault of the defendant or counsel or anyone else involved in this case as to what happened to those tapes. So all I can do is urge you to do everything you can not to prejudice either the prosecution or the defense in this matter. Because unless something changes, we will not be able to hear the tapes that had been—one had been partly played to you and the others had merely been identified. I just don't want you in any way to think either the prosecution or the defense had anything to do with the disappearance of the tapes. I don't know what happened to them. They don't know either. All I can tell you is that the courtroom was opened to some extent during the lunch hour yesterday, and when we came back, why, they were gone. So I know you're most anxious to perhaps listen to them or know what happened to them, and I would be too, but that's where we are. In the meantime, both the prosecution and the defense will do the best they can under those circumstances."

The following also ensued:

"THE COURT: At this point the court will inquire of all of the jurors, and

the alternate juror, if at this time there is any one of you who feels they could not be fair and impartial in this trial in view of the loss of the tapes. If so, would you raise your hand.

"The record will show that no one raised their hand. You may proceed."

Kirk's motion for a mistrial was in the following form: "For the record, the defense moves for a mistrial on the grounds that the trial is not concluded; the remarks by the court, obviously well intentioned and well meaning, are of such a nature that this jury, I submit, is prejudiced to the point that they cannot render a fair and just verdict under the evidence before them because, if for no other reason, now the jury has been alerted to the fact that the tapes are now gone, without the supposition as to who they were taken by or in what manner. And I would submit that the very nature of that type of thing—and I realize it is a new occurrence, perhaps for the court and certainly for me—is of such a nature that I do make a motion for mistrial."

Kirk argues that the "only reasonable inference that could be drawn by the jury was that the defendant was responsible for the tapes," and that it therefore became "impossible for [him] to receive a fair trial."

We disagree. We conclude that such prejudice, if any there was, was averted by the court's prompt admonition to the jury.

III. Kirk's several final contentions also relate to the tapes we have discussed.

 He first argues that "secondary evidence, consisting of oral testimony concerning the contents of the tape recording [was] improperly admitted into evidence."

It is true that a tape recording is to be deemed a "writing" (see Evid. Code, § 250) for the purposes of the best evidence rule (see Evid. Code, §§ 1500-1510).

But Evidence Code section 1501 provides that: "A copy of a writing is not made inadmissible by the best evidence rule if the writing is lost or has been destroyed without fraudulent intent on the part of the proponent of the evidence." And Evidence Code section 1505 states: "If the proponent does not have in his possession or under his control a copy of the writing described in section 1501 . . ., other secondary evidence of the content of the writing is not made inadmissible by the best evidence rule . . . ." Under these statutes, secondary evidence of the lost tapes' content was not inadmissible. The secondary evidence, being logically relevant to issues in dispute, was rendered admissible by Evidence Code section 351.

Kirk argues that the tapes were not authenticated before secondary evidence of their contents was permitted. The record clearly establishes the contrary; from it the court could, and presumably did, determine the time, place and circumstances of their making, and that they were true voice recordings of Kirk.

It is then argued that at least there was no authentication of the tape played before the jury, prior to the time of its playing. Here again the record shows the contrary; the prosecutor fully explained the "authenticating" circumstances which he later proposed to prove. Certainly there is no requirement that, prior to an opening jury statement, a party formally "authenticate" all documentary evidence which he proposes to mention to the jury in the opening statement.

■ Nor do we find merit in Kirk's contention of error, since a part was played, in not requiring the entire tape to be played before the jury at the time.

We observe no prosecutorial misconduct, as argued by Kirk, in relation to the heretofore described playing of the tape recording.

Relevant generally to the several instant contentions of Kirk concerning the use of the tape recordings in the prosecution's opening jury statement, is *People* v. *Green,* 47 Cal.2d 209, 215 [302 P.2d 307]. ■ There the court said: "The purpose of the opening statement 'is to prepare the minds of the jury to follow the evidence and to more readily discern its materiality, force and effect' (*People* v. *Arnold* (1926) 199 Cal. 471, 486 [250 P. 168]), and the use of matters which are admissible in evidence, and which are subsequently in fact received in evidence, may aid this purpose. In the circumstances, we conclude that it was within the discretion of the trial court to permit the use, in connection with the opening statement, of the pictures which were subsequently received in evidence." No substantial distinction is reasonably to be made between the use, in opening statements, of unauthenticated pictures and unauthenticated voice recordings.

Apparently claiming error, Kirk points out that although he permitted a search of his vehicle and person for the missing tapes, "the deputy district attorney, his investigators or police officers working in association with him," did not. We find neither error, nor prejudice resulting to Kirk since the jury had no knowledge of the alleged circumstances.

IV. ■ We consider on our own motion, the probable effect on Kirk's constitutional fair trial guarantee, of the partial use, and the subsequent loss, of the voice recordings.

We observe that the first portion of the recording (quoted *ante*) played before the jury, indicated Kirk's presence in Hawaii at a time when some of the "stolen" traveler's checks were there cashed. The fact of Kirk's presence in Hawaii at that critical time was, we opine, established by other evidence beyond any reasonable doubt. And we note that there was no evidentiary conflict on the subject.

The second portion of the recording indicated that Kirk had plans "to make some money through the insurance companies periodically on claims and stuff like tenant policies up to five thousand . . . cameras, stereos, jazz like that." This intent was also established by the testimony of the person to whom the record was delivered. And the evidence of Kirk's guilt of the insurance company fraud was, we think, apart from the recordings, overwhelming.

Further, we observe that although the entire contents of the recordings were obviously known to Kirk, he made no showing in the superior court of prejudice resulting from his inability to present other portions of the recording to the jury. Nor do we observe any superior court motion to strike the recording, or for appropriate admonition to the jury that they disregard it.

Indeed, Kirk himself appeared to consider the probative weight of the recordings to be slight as compared with the whole evidence. In an *in camera* discussion of their disappearance, and possible responsibility therefor, his attorney commented: "But let's be honest with each other, shall we, please. If anybody is going to take any evidence, they sure as hell aren't going to take two tapes, with all that other stuff."

We conclude that the circumstances of the use of the recordings, and their subsequent disappearance, did not in any substantial way impinge upon Kirk's right to a fair trial. Further, even assuming error, *arguendo*, in the premises, we are of the opinion, after an examination of the entire cause, including the evidence, that it is not reasonably probable that a result more favorable to Kirk would have been reached in the absence of the complained of error. (See Cal. Const., art. VI, § 13; *People* v. *Watson*, 46 Cal.2d 818, 836 [299 P.2d 243].)

The order granting probation is affirmed.

Molinari, P. J., and Sims, J., concurred.