[No. G003813. Fourth Dist., Div. Three. Apr. 19, 1989.]

THE PEOPLE, Plaintiff and Respondent, v.
TERRY LEE HUSTON, Defendant and Appellant.

[No. G006508. Fourth Dist., Div. Three. Apr. 19, 1989.]

In re TERRY LEE HUSTON on Habeas Corpus.

194

**COUNSEL**

Terry L. Huston, in pro. per., and Patrick J. Hennessey, Jr., under appointment by the Court of Appeal, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Steve White, Chief Assistant Attorney General, Janelle B. Davis and Jeffrey J. Koch, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**SCOVILLE, P. J.**—Defendant Terry Lee Huston appeals his conviction and sentencing for 10 counts of robbery, on 8 of which he was found to have used a firearm. Consolidated with this appeal is his petition for a writ of habeas corpus, based on supposed collateral estoppel from the dismissal of similar robbery charges in Los Angeles County following his conviction for the Orange County robberies at issue here. In connection with his appeal, defendant asks us to make certain factual determinations the trial court declined to make as to defense documents allegedly lost or destroyed by the police.

### FACTS

#### *The Robberies*

Between April 27 and November 23, 1983, robberies took place at two Lucky Store supermarkets, three Albertson's grocery stores, and five Alpha Beta supermarkets in Orange County. The victims' accounts of the robber's appearance and modus operandi suggested a single perpetrator. The similarities included the following: nine victims said the robber had a bushy and/or "Fu Manchu" moustache (a tenth mentioned a "light moustache"). Nine described the robber's hair or moustache as some shade of red (ranging from "strawberry blond" to "reddish brownish"). Eight said he wore some sort of cap. In the first two or three robberies, the robber brought his own bag to put the money in; thereafter, he ordered the victims to get a bag for the money. Six of the robberies ended with the robber ordering or suggesting that the victim go call the police. In five cases, the robber called attention to a gun, or a concealed object possibly a gun, by words to the effect of "Do you see this?" or "Do you see what I have in my pocket?" In the first six robberies, the robber was wearing a corduroy jacket or coat, variously described as beige, brown, gold or rust in color. Four victims said the robber had a bad or pock-marked complexion. In four of the later robberies, the robber displayed some sophistication as to where money can be hidden in a safe. Four of the robberies began with the robber's asking if the victim was the store manager.

In two cases, the robber wore sunglasses; in another, he wore what appeared to be prescription glasses.

Defendant has reddish hair and a rough complexion. At the time of his arrest, he had a moustache. Defendant's brother Richard has similar hair, and had a bad complexion at times during 1983 due to amphetamine use. During much of 1983, Richard wore a moustache. At defendant's trial,

Richard admitted owning a brown corduroy jacket and about a dozen baseball caps.

The dates of the robberies were: April 27, May 1, May 28, June 3, June 15, July 11, July 25, August 15, November 14, and November 23.

Victims in all 10 robberies identified defendant at trial as the man who robbed them.

### Search of Residence and Subsequent Arrest

On November 23, 1983, San Diego police contacted the Orange County Sheriff's Department with the news that a confidential informant had named defendant as involved in market robberies in the San Clemente or Orange County area. The Orange County authorities also learned defendant was on parole for armed robberies committed in San Diego County, and that he lived in the area of Julian, California. On November 28, 1983, the Orange County authorities obtained an arrest warrant for the May 28 robbery, based in part on photographic identifications of defendant by two witnesses (including one victim) to that robbery. Orange County and San Diego officers attempted to serve the warrant at the residence of J. Clark in Julian, California. They had obtained the address by connecting it with a phone number supplied by the informant. When they arrived at the residence, the owner Joyce Clark said defendant was out for the evening. The officers asked and obtained permission to search the house for defendant. In the course of the search they found articles of clothing matching those worn by the robber in some of the robberies. They also found two checks on a Bank of America account in Julian. The checks bore the imprint of defendant's business, Back Country Services. As is discussed in more detail below, the search of this residence was later held illegal and all items found in the search were ordered suppressed.

Defendant was arrested shortly after this search in a traffic stop.

### Refusal to Participate in Lineup

On the evening of November 30, Orange County Sheriff's Department personel attempted to conduct a lineup including defendant at the Orange County jail. All members of the lineup were to wear baseball caps, sunglasses and white jackets. Defendant's public defender had not yet arrived on the scene. Defendant refused to take part in the lineup wearing a cap and sunglasses. The investigator in charge of the lineup read defendant a statement indicating the prosecutor would be able to comment on his refusal. The investigator also read defendant a statement informing him that a claim

of unfairness was not sufficient reason to refuse to take part in a lineup, and that his attorney would be able to argue unfairness to the jury. Defendant continued to refuse to participate so long as the lineup included the cap.

The public defender, Lewis Clapp, who arrived to represent defendant was inexperienced and unfamiliar with the case. When Clapp arrived, the investigator showed him the arrangements for the lineup. In Huston's presence, Clapp said, "It appears to be a fair line-up to me. And I can see no valid reason for your refusal." Defendant and Clapp then discussed the matter privately. After this conference, Clapp first declined to advise defendant whether or not to participate, then said he advised defendant not to participate without a court order. The lineup was abandoned until a court order was obtained. By the time the court-ordered lineup was conducted, defendant had shaved off his moustache and cut his hair. Despite these alterations, seven victims and witnesses identified him as the robber at this lineup.

### Loss of Alleged Alibi Documents

Defendant elected to represent himself, with an attorney as cocounsel. He asked Joyce Clark and his brother's girlfriend Barbara Bence to look for certain specific documents, and for any documents among defendant's belongings which were dated on or near the dates of the robberies.

Bence later testified she located the following documents: a ticket stub for the US Festival, dated June 3, 1983; an invoice from Lake Cuyamaca for a fishing permit, dated August 15, 1983; and a carbon copy of an all day boat rental from Lake Cuyamaca, also dated August 15, 1983. The robbery charged in count 4 of the information took place around 9:30 p.m. on June 3; the robbery in count 8 occurred around 9 p.m. August 15.

The festival ticket stub bore no information indicating defendant had purchased the ticket; the fishing permit and boat rental documents did bear defendant's name. Bence testified she had found the documents dated August 15, 1983, in a box she and Richard Huston had stored for Huston when he moved out of their house in March 1983.

Clark asserted she located between 50 and 75 papers relating to the dates of the robberies. From these documents and those Bence had found, defendant selected 12 he believed critical to his defense. These documents included the three described above, and the following: (1) Regarding counts 3, 7, and 10, and generally: records from defendant's towing and hauling business, allegedly indicating he had been towing cars or hauling trash on certain dates, and establishing his financial stability and consequent lack of motive

for robbery; (2) Regarding count 1: restaurant receipt from Country Kitchen Restaurant, allegedly dated April 27, 1983; (3) Regarding count 2: gasoline receipts bearing certain dates, including May 1 and 2, 1983; (4) Regarding count 2: rental car receipt from San Diego rental agency dated May 1, 1983; (5) Regarding count 8: invoice for road services defendant rendered to E. Talamantez, allegedly dated July 25, 1983.

Defendant, who was in custody in the Orange County jail, stored these documents in his cell.

On May 10, 1984, defendant was temporarily confined to a cell in the "punishment tank," in which prisoners were not allowed to have means of entertainment such as magazines. As a pro. per. prisoner, defendant was allowed to have legal materials in this cell. He had a box marked as containing legal files. Because of concern that jail deputies or prisoner informants might search his files in his absence, he had hidden the alibi documents Clark had brought him in a Playboy magazine.

Some of the inmates in the punishment tank were rattling bars and yelling. Jail personnel decided to conduct a punitive "shakedown search" of the area. Deputies Krueger and White searched defendant's cell in the punishment tank. Both of them knew of defendant's pro. per. status.

The deputies looked through defendant's box of legal materials for any contraband or weapons and found several Playboy magazines in brown mailing wrappers. The deputies seized these magazines. Defendant objected strenuously, saying the magazines were, or one of the magazines was, necessary to his defense. When asked to explain what was in the magazines that he needed, he refused, on the ground the information was confidential. All the testimony concerning this confrontation indicates defendant did *not* say the magazine contained documents or loose items. The deputies assumed defendant was referring to articles in the magazines, not items inserted into the magazines; indeed, Deputy Krueger asked defendant "what articles" he needed, and Deputy Sheriff Duran, who witnessed the encounter, testified that defendant himself referred to "articles . . . he needed for his legal defense." Deputy White testified to a similar statement, and also said defendant responded to his questions by saying, "Playboys are considered legal materials." Defendant testified the Playboy he used as a hiding place also contained an article which he thought might prove useful to the defense.

The confiscated magazines were put in a brown bag, which was placed in a room where property was held for prisoners in the punishment tank. The bag contained no property belonging to other prisoners. The holding room

was kept locked and only prison employees had keys, although inmates were allowed in the room on some occasions.

When jail deputies returned the bag containing the Playboys to defendant, any documents defendant had hidden there were missing, as were some of the foldouts.

Of all the documents allegedly lost, the defense obtained a copy of only one, the San Diego rental car receipt. Both Joyce Clark and defense investigator Gerrold Snyder contacted people at Lake Cuyamuca in attempts to obtain copies or other evidence of the fishing permit and boat rental, without success. Snyder tried to telephone E. Talamantez, whose car defendant had allegedly towed on July 25, 1983, but could not reach her. Snyder also tried to telephone Dave McIntosh, owner of a San Diego gas station, whom defendant allegedly saw on one of the nights in question; Snyder stopped at the gas station on his way home from Lake Cuyamaca and left a message for Mr. McIntosh, but did not return to San Diego to find him. Clark did not contact any oil companies to try to find duplicates of the missing gas station receipts, nor was Snyder asked to do so. Neither Clark nor Snyder contacted the Country Kitchen Restaurant; Clark testified she knew this would be fruitless, as she had worked there and knew the restaurant kept no copies of receipts.

*Hearing on Motion to Dismiss*

On August 24, 1984, defendant brought a nonstatutory motion to dismiss, or alternatively for curative jury instructions, on the ground the jail personnel had lost or destroyed documents critical to his defense. He asserted the documents themselves were irreplaceable alibi evidence and would, moreover, have helped the defense locate disinterested alibi witnesses.

Defendant and his cocounsel asked the court to hear all testimony concerning the contents of the documents in camera. They argued that requiring witnesses to describe, on the record and in the presence of the district attorney, the contents of the lost alibi documents would give the prosecution premature notice of major portions of defendant's defense. While sympathetic to defendant's position, the court declined the request, stating the prosecution's right to full cross-examination outweighed defendant's right to delay disclosure of his defense, given that defendant had brought the matter to court in the first place and was seeking the extraordinary remedy of dismissal. Defendant's witnesses accordingly testified to the contents of the lost documents, as described above. The court ordered the prosecution not to use "this testimony" in its case-in-chief.

The court denied the motion to dismiss, on the basis that the sheriff's department did not act maliciously or intentionally to lose or destroy defense documents. The court also made the following factual determinations, which it described as "only made for appellate purposes and for this motion": (1) The Country Kitchen receipt existed and was inside the magazine, but did not necessarily bear the date April 27, 1983. The court doubted defendant's credibility on this point because the defense had not contacted any of the three hostesses on duty on that date. The court also implied the loss of this receipt was not that detrimental, given that Clark, and possibly one or more of the hostesses, could testify to defendant's dining at the restaurant.

(2) The rental car receipt (of which defendant had located a copy) existed and was in the magazine.

(3) The gas receipts for May 1 and May 2 did not exist. The court was unwilling to accept, without some substantiation, the defense claim that the gas stations had delivered to defendant embossed receipts for cash (not credit) payments.

(4) Towing records existed, but did not necessarily bear the dates the defense claimed. The court stated its belief the information in these records could be reconstructed from the records of the stations to which defendant towed various cars.

(5) The US Festival ticket existed and was in the magazine, but was not necessarily dated June 3. The court noted defendant had available several alleged witnesses to his presence at the festival on that date.

(6) The towing invoice for services rendered to E. Talamentez existed and had been in defendant's possession, but was not necessarily dated July 25.

(7) No financial records from defendant's business were in the magazine when it was seized. This finding may have been based on a misunderstanding of the testimony concerning the physical dimensions of these documents.

(8) The fishing permit and boat rental receipt from Lake Cuyamaca existed; the boat rental receipt bore defendant's name, was in the magazine, and was dated August 15, 1983.

(9) The sheriff's department did not maliciously or intentionally seize the documents found to exist in the magazine. The court stated its belief the deputies would have left the documents with defendant if he had disclosed

the documents' presence. The court found the items in the magazine when it was taken were missing when it was returned, but specifically refused to make a finding as to who, if anyone, removed documents from the magazine.

The court refused to order or countenance any curative instructions going further than the factual determinations listed above, and suggested that even those determinations would not be binding on the jury. The court noted defendant could introduce evidence concerning the documents and their loss. The only remedy the court considered appropriate was to sever those counts for which alibi documents had been lost from the other counts. The defense pointed out such a remedy would undercut its theory that, given the similar descriptions and modi operandi, a defense to one robbery was a defense to all.

### Motion to Recuse District Attorney's Office

After denial of his motion to dismiss, defendant moved to recuse the district attorney's office on the ground that office had participated in hearings in which much of his defense was revealed. The motion was denied.

### Motion to Suppress Fruits of Arrest and of Residential Search, Ruling on Motion, Clarification of Ruling

Defendant moved to suppress the items seized in the residential search, as well as the items found on his person when he was arrested, photographs taken of him and of his clothing after arrest, and all evidence pertaining to the abortive and successful lineups. Defendant contended the affidavit supporting the application for the arrest warrant omitted material information, namely the failure of witnesses to other similar robberies to identify defendant in photographic lineups, and also contained no clear indication the photograph identified by the May 28 victims was defendant's. As to the residential search, defendant asserted, inter alia, lack of consent to entry, failure to fulfill conditions for a parole search, and lack of a basis for believing defendant resided there. The moving papers included a list of all items the motion sought to suppress.

In ruling on the motion, the court stated: "[We] will grant the 1538.5 and suppress the items *that were found inside the residence.*" (Italics added.) Although stating it was "specifically not going to reach the issue of whether or not the [arrest] warrant's good," the court opined the warrant was good on its face and would have sufficed to justify the arrest, rendering evidence obtained by the arrest admissible. The minute order for June 12, 1985, the date of this ruling, reads in pertinent part: "Court heard argument on

1538.5 PC motion. Motion granted and Court suppresses items found in residence."

On July 30, 1985, during argument on a motion to suppress bank records, defendant's cocounsel indicated her belief that all items listed in the earlier suppression motion had been ordered suppressed. The court stated that such had not been its intention and, if the minute order had mistakenly suppressed all these items, that order was corrected nunc pro tunc.

### Motion to Suppress Bank Records

On June 19, 1985, William Heiden, an investigator for the district attorney's office, went to Julian to interview the owners of local businesses about defendant. He took with him photocopies of the two Bank of America checks which had been seized in the residential search and had just (on June 12) been ordered suppressed. He did not realize the checks had been found in the residence, but believed they had been on defendant's person when he was arrested. Even without these checks, Heiden would have known that defendant ran a business in Julian called Back Country Services and was likely to have a business bank account in Julian; he obtained this information from a deputy district attorney, who learned it from testimony at the hearing on defendant's nonstatutory motion to dismiss. In addition, he had seen a Back Country business card which had been found in defendant's wallet.

Heiden went to the Julian branch of Bank of America and showed employees a photograph of defendant and the copies of the checks from defendant's Back Country business account. Two bank employees gave Heiden extensive information about cash deposits defendant had made. On the basis of this information, Heiden obtained a search warrant and seized bank records later used at trial.

Defendant moved to suppress the bank records seized under the search warrant, on the ground these records were "fruit" of the illegally seized checks Heiden had shown the bank employees, and on the further ground the bank employees' statements on which the search warrant was based had violated Government Code sections 7460 et seq., the Financial Privacy Act. The court denied this motion, in part on the ground that the employees' statements were based on recollection rather than on bank records, and hence were not covered by the Financial Privacy Act. While not explicitly

saying so, the court also appeared to base its ruling on the doctrines of independent source and/or inevitable discovery.[1]

*Denial of Motion to Suppress Lineup Refusal, Evidence re Refusal, Instruction re Refusal*

Defendant moved to suppress all evidence of his refusal to participate in a lineup on November 30, 1983. The court denied this motion on the ground the probative value of the evidence outweighed the potential prejudice (Evid. Code, § 352), noting the jury could decide whether his refusal was based on advice of counsel, consciousness of guilt, or other factors.

At trial, the prosecution presented testimony concerning defendant's refusal to participate despite the warnings given him, and concerning his subsequent change in appearance. The defense, on cross-examination, elicited testimony concerning defendant's objection to the use of hats and sunglasses in the lineup and Public Defender Clapp's advice not to participate without a court order.

In instructing the jury, the court read a modified version of CALJIC No. 2.06, as follows: "If you should find that a defendant attempted to suppress evidence against himself in any manner such as by refusing to appear in a lineup and/or by a deliberate attempt to alter his appearance prior to a lineup, such attempts may be considered by you as a circumstance tending to show a consciousness of guilt. However, such evidence is not sufficient in and of itself to prove guilt; and its weight and significance, if any, to be attached thereto, are matters for your consideration. And if you find from all of the evidence surrounding such refusal or alteration attempts that they were done with a state of mind or purpose other than to suppress evidence, you should disregard them."

*Renewed Request for Jury Instructions on Lost Documents*

Before putting on its case, the defense asked the trial court to rule on its request for curative jury instructions regarding the lost documents, as the pretrial judge had deferred the matter. Defense counsel offered to call its witnesses again, as the trial court did not wish to use the transcript of the earlier hearing. The prosecution argued the request for instructions was premature, and suggested any evidence of document destruction be submitted to the jury. The court took the position that the request for curative instructions had already been litigated and denied, but suggested the

---

[1] Contrary to suggestions in the parties' briefs, the judge did not purport to apply a "good faith mistake" rule, but rather, disclaimed any such ruling.

defense could still request instructions on the issue. A requested instruction was ordered "filed." The requested instruction was not given.

### Conviction and Sentencing

The jury found defendant guilty of all 10 counts of robbery, and found 8 of the firearm-use allegations to be true. The priors charged having been severed, the court found the allegations of prior convictions to be true. Defendant filed a motion for new trial, which the court denied.

The court sentenced defendant to the upper base term of five years on count 1, and imposed one additional year for each of counts 2 through 10. The court imposed a two-year enhancement on the firearm-use finding concerning count 1, and eight-month enhancements on the other seven firearm-use findings. Finally, the court imposed a one-year enhancement for a prior prison term and two 5-year enhancements for prior felony convictions. The court ruled all sentences were to run consecutively, for a total of 31 years and 8 months in state prison.

The court gave the following reasons for choosing the aggravated base term: absence of mitigating factors; exceptional threat of great bodily injury based on use of a weapon; multiple victims in some cases; premeditation and sophistication; defendant's prior convictions and parole status; numerous offenses. Its cited reasons for imposing consecutive sentences were: numerous offenses; separate times and places; separate aims; separate victims; separate degree of violence; some multiple victims.

In addition to appealing his conviction and sentencing, defendant filed a petition for writ of habeas corpus, on the ground that subsequent to his conviction on the charges filed in Orange County, the Los Angeles Superior Court had dismissed similar charges against him on the basis of the lost documents, and that such dismissal precluded contrary findings concerning his Orange County motion to dismiss and necessitated a similar dismissal of the Orange County charges. He also filed an application for factual determinations based on appellate record, asking this court to fill in findings the trial court had declined to make.

### Arguments on Appeal

In his appeal, defendant contends the trial court made the following prejudicial errors: (1) Refusing to hear his evidence concerning the nature and contents of the lost documents in camera; (2) Denying his motion for dismissal or curative jury instructions as a sanction for loss of his alibi documents; (3) Denying his motion to recuse the district attorney's office;

(4) Allowing evidence of his refusal to participate in a lineup; (5) Instructing the jury it could, under certain circumstances, consider defendant's lineup refusal and alteration of his personal appearance as tending to show consciousness of guilt; (6) Denying his motion to suppress evidence flowing from his arrest (e.g., items found on his person, identifications at lineups) after allegedly granting the motion at an earlier hearing; (7) Denying his motion to suppress bank records; (8) Imposing sentence on basis of improper factors.

In addition, he reiterates the contention on which he bases his petition for writ of habeas corpus, namely, that dismissal of the charges in Los Angeles County requires dismissal of the Orange County charges.

## DISCUSSION

### I. *Motions Concerning Lost Alibi Documents*

#### A. *Refusal to Hold Hearing in Camera*

Defendant came into court seeking the extraordinary sanction of dismissal or, in the alternative, jury instructions seriously detrimental to the prosecution. It was the court's task to determine if such sanctions were appropriate: to determine whether the alleged documents had existed; had been lost due to government action; and had been material, exculpatory and irreplaceable. (See discussion below as to standards for imposition of sanctions for loss of evidence.)

 Defendant argues the court should have heard all evidence on these points in camera, and that the court's refusal to exclude the prosecution from the hearing constituted an unconstitutional forced disclosure of defense evidence.

 *Prudhomme* v. *Superior Court* (1970) 2 Cal.3d 320, 326 [85 Cal.Rptr. 129, 466 P.2d 673] established the principle that a defendant cannot be ordered to disclose any information that could have the effect of lightening the prosecution's burden of proof. *Allen* v. *Superior Court* (1976) 18 Cal.3d 520, 525 [134 Cal.Rptr. 774, 557 P.2d 65] made clear this rule is based upon article I, section 15 of the California Constitution, the state constitutional privilege against self-incrimination. Defendant contends the open hearing constituted just such a coerced disclosure, in that he was forced to choose between prematurely disclosing details of his alibi defense and abandoning his motion to dismiss.

*Prudhomme* and *Allen,* however, involved court orders compelling a defendant to disclose the identities of his witnesses. Defendant, on the other

hand, was confronted not by an order, but by a difficult dilemma: whether to disclose this information before he would normally do so, or abandon his motion for dismissal. Comparable dilemmas have been held not to constitute coerced disclosures. *People* v. *Jasper* (1983) 33 Cal.3d 931, 932-934 [191 Cal.Rptr. 648, 663 P.2d 206], reaffirming *People* v. *Coleman* (1975) 13 Cal.3d 867 [120 Cal.Rptr. 384, 533 P.2d 1024], held that a probation revocation hearing based on a charge of criminal conduct may be held prior to the trial on the underlying criminal offense, despite the choice such a sequence frequently imposes on the defendant: to keep silent at the revocation hearing, thereby increasing his chances of going to prison, or to testify to mitigating circumstances and possibly incriminate himself. Such a choice, it was held, does not prevent the defendant's testimony from being "voluntary." The only safeguard constitutionally required is exclusion of such testimony and its fruits from the subsequent criminal trial, save for purposes of impeachment or rebuttal.

*People* v. *Weaver* (1985) 39 Cal.3d 654, 659-660 [217 Cal.Rptr. 245, 703 P.2d 1139], holding the *Coleman/Jasper* exclusionary rule was a "statutory privilege" unaffected by passage of Proposition 8, reaffirmed *Jasper*'s conclusion that this exclusionary rule affords "adequate relief from any dilemma posed by the 'constitutional tension'" between the various rights involved. *People* v. *Samuels* (1983) 147 Cal.App.3d 1108, 1113-1114 [195 Cal.Rptr. 598] held the *Jasper/Coleman* principles applied not only to testimony of defendants or defense witnesses, but to release of the identities of potential defense witnesses.

This distinction between a difficult, but voluntary choice to disclose evidence and involuntary disclosure has been applied outside the probation revocation context. In *People* v. *Kelly* (1986) 183 Cal.App.3d 1235, 1243-1244 [228 Cal.Rptr. 681], the trial court's refusal to sever defendant's trial from that of a codefendant had the effect, due to the special rules affecting joint trials, of requiring defendant to take the stand instead of relying on a taped statement made to police. The defendant argued denial of his motion to sever constituted implicit coercion of his testimony. The reviewing court rejected this argument, finding the defendant's position analogous to that found acceptable in *Jasper,* and his testimony "voluntary" rather than "compelled." The court further noted that any defendant is confronted with a comparable dilemma when he decides whether to testify, thereby subjecting himself to cross-examination, or to remain silent and leave some potential defense unstated.

We find these authorities so analogous to defendant's situation as to be controlling. Defendant's rights were adequately protected by the court's order that the testimony concerning the alibi documents could not be used

in the prosecution's case-in-chief. While the court did not explicitly prohibit use of the fruits of such testimony, there is no indication the prosecution sought to use any such evidence, and the defense never objected to any evidence on this ground.

Moreover, it is difficult to conceive how the People's due process rights (see *Stein* v. *New York* (1952) 346 U.S. 156, 197 [97 L.Ed. 1522, 1549, 73 S.Ct. 1077], overruled on other grounds in *Jackson* v. *Denno* (1964) 378 U.S. 368, 391 [12 L.Ed.2d 908, 923-924, 84 S.Ct. 1774, 1 A.L.R.3d 1205]) could have been protected if the hearing on defendant's motion to dismiss had been held in camera. To resolve that motion, the court had to decide whether to accept defendant's description of the lost documents, his characterization of their importance, and his suggestions as to the government's degree of culpability. In contending these decisions could properly have been reached without the district attorney's presence and involvement, defendant essentially asserts the trial court had no need for adversary proceedings in its quest for the truth on these crucial issues. This assertion is inconsistent with the fundamental underpinnings of American jurisprudence.[2]

If "the 'tactical' prejudice that may result from having to present evidence and testimony in defense of a motion to revoke probation is not sufficient to mandate that revocation hearings be continued until after trial" (*People* v. *Johnson* (1984) 159 Cal.App.3d 163, 167 [205 Cal.Rptr. 427]), then a fortiori, the temporary tactical advantage to be gained in withholding alibi evidence until trial cannot possibly suffice to exclude the People from determination of potentially dispositive issues raised by a motion to dismiss.[3]

### B. *Merits of Motion for Dismissal or Instructions*

During the pendency of this appeal, the United States Supreme Court decided *Arizona* v. *Youngblood* (1988) 488 U.S. 51 [102 L.Ed.2d 281, 109

---

[2] The subsequent events in Los Angeles illustrate the disadvantages of defendant's suggested procedure. The decision of the Los Angeles court to hear evidence on similar issues in camera left the district attorney powerless to oppose defendant's motion to dismiss on factual grounds.

[3] Dicta in *People* v. *Dennis* (1986) 177 Cal.App.3d 863, 871 [223 Cal.Rptr. 236], approving in camera *Marsden* hearings (*People* v. *Marsden* (1970) 2 Cal.3d 118 [84 Cal.Rptr. 156, 465 P.2d 44], is distinguishable. As defendant frankly points out, and as the *Dennis* court noted, a *Marsden* hearing concerns which attorney shall in future represent the defendant, a matter in which the People generally have no interest. Nor does the existence of some limited statutory schemes for in camera hearings under dissimilar circumstances render an in camera hearing appropriate, let alone mandatory, on a motion for dismissal or other sanctions for loss of evidence.

S.Ct. 333]. *Youngblood* stated and applied the rule that "unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law." (*Id.* at p. 58 [102 L.Ed.2d at p. 289, 109 S.Ct. at p. 337].) The court clearly distinguished between "bad faith" and mere negligence.

The *Youngblood* opinion did not discuss whether this rule should be applied retrospectively to other pending cases. The court did comment that the Arizona court, in finding good or bad faith irrelevant, had made "a sharp departure" from earlier United States Supreme Court precedent (488 U.S. at p. 56 [102 L.Ed.2d at p. 288, 109 S.Ct. at p. 336]): this comment suggests the court did not view *Youngblood* as establishing a new rule, let alone a rule to be limited to future cases. ■ Moreover, *Griffith* v. *Kentucky* (1987) 479 U.S. 314, 322-323, 328 [93 L.Ed.2d 649, 658, 661-662, 107 S.Ct. 708] established that new constitutional rules for the conduct of criminal prosecutions apply retroactively to all state or federal cases pending on direct review. While neither *Griffith* nor any other case we have found deals directly with whether new rules favoring the prosecution are to be so treated, *Griffith*'s language is unqualified.[4]

If we apply *Youngblood* in our review of the denial of defendant's motion to dismiss,[5] we must affirm that denial: there was no direct evidence of government bad faith, and the possible inferences of same were not so compelling as to make the court's refusal to find bad faith unreasonable. We need not, however, actually decide the extent of *Youngblood*'s retrospective

---

[4]Before *Griffith* and the cases leading up to it, the United State Supreme Court took the view that the federal Constitution neither prohibited nor required retrospective application of a new, constitutionally based rule of criminal procedure. (*Desist* v. *United States* (1969) 394 U.S. 244, 248-249 [22 L.Ed.2d 248, 254-255, 89 S.Ct. 1030]; *Tehan* v. *Shott* (1966) 382 U.S. 406, 410 [15 L.Ed.2d 453, 456, 86 S.Ct. 459].) The decision whether such a rule should be applied retrospectively was one of judicial policy, to be made according to the following criteria: the purpose of the new rule, in particular the degree to which it sought to overcome aspects of criminal trial procedure which substantially impair truth-finding functions; the extent of reliance on the superseded rule; and the effect of retrospective application of the new rule on the administration of justice. (*Brown* v. *Louisiana* (1980) 447 U.S. 323, 328 [65 L.Ed.2d 159, 165-166, 100 S.Ct. 2214]; *Desist* v. *United States, supra*, 394 U.S. 244, 249-250 [22 L.Ed.2d 248, 255]; *Tehan* v. *Shott, supra*, 382 U.S. 406, 413, 415 [15 L.Ed.2d 453, 458, 459].)

[5]In *Youngblood*, the trial court "instructed the jury that if they found the State had destroyed or lost evidence, they might 'infer that the true fact is against the State's interest.'" (*Arizona* v. *Youngblood, supra*, 488 U.S. at p. 54 [102 L.Ed.2d at p. 287, 109 S.Ct. at p. 335].) The state did not appeal the giving of this instruction. It is therefore arguable *Youngblood*'s holding is binding authority only as to *dismissals* for destruction of evidence, and would not affect a motion for corrective jury instructions. Since we find it unnecessary to decide whether *Youngblood* applies retrospectively, we also need not decide whether its threshold bad-faith requirement would apply to Huston's alternative request for corrective jury instructions.

application. ■ The trial court's denial of defendant's motion for sanctions was proper, even if defendant was not required to show government bad faith under *Youngblood*.

■ *California* v. *Trombetta* (1984) 467 U.S. 479, 488-489 [81 L.Ed.2d 413, 422, 104 S.Ct. 2528] established the rule that due process is violated by government failure to preserve evidence, and sanctions of *any* sort are appropriate, *only* if the evidence could have been expected to play a significant role in the defense, i.e., the exculpatory value of the evidence was apparent before its destruction and comparable evidence cannot be obtained by reasonably available means. We adhere to our holding in *People* v. *Gonzales* (1986) 179 Cal.App.3d 566, 572 [224 Cal.Rptr. 853] that *Trombetta* displaces the looser standard of materiality set forth in *People* v. *Hitch* (1974) 12 Cal.3d 641, 649 [117 Cal.Rptr. 9, 527 P.2d 361]. (See also *People* v. *Epps* (1986) 182 Cal.App.3d 1102, 1114, 1117 [227 Cal.Rptr. 625]; *Scott* v. *Meese* (1985) 174 Cal.App.3d 249, 257 [219 Cal.Rptr. 857].) As *Trombetta* was decided June 11, 1984, more than two months before defendant filed his motion to dismiss, the *Trombetta* standards apply to that motion.

■ The evidence presented below supports the denial of sanctions for loss of defendant's documents. Neither the exculpatory value of the evidence, nor the very existence of the evidence, was apparent to the deputies when they confiscated the magazine in which the documents were concealed. There is no evidence any government employee or agent ever saw the documents.

The court also found evidence comparable to several of the missing documents could be, or with due diligence could have been, obtained by reasonable effort. Defendant has not shown this finding to be unsupported by the evidence; moreover, our review of the evidence supports that finding, especially as to some of the towing logs and the invoice for road services rendered to E. Talamentez. Moreover, defendant had already, at the time of the hearing, obtained a copy of the May 1, 1983, rental car receipt. As defendant has stressed on numerous occasions, the similar descriptions and modi operandi for the various robberies made an alibi defense to one charge a defense to all; the fact that defendant had, or could have obtained, alibi documents or testimony on some of the charges, was helpful as to all the charges.

Even if *Trombetta*'s standard of materiality did not apply—a point on which no final ruling has yet issued from our Supreme Court (see *People* v. *Griffin* (1988) 46 Cal.3d 1011, 1021 [251 Cal.Rptr. 643, 761 P.2d 103]; but note *People* v. *Johnson* (1989) 47 Cal.3d 1194 [255 Cal.Rptr. 569, 767 P.2d 1047], time for grant or den. of rehg. extended, holding *Trombetta* applica-

ble in California)—the sanctions defendant sought would be inappropriate, given defendant's responsibility for the loss of his documents. Whether or not we accept defendant's claim to have been ignorant of the rule against entertainment magazines in the punishment tank—an ignorance supposedly retained despite several prior confinements to that tank—his refusal to give even a minimal explanation once the magazine was seized is an instance of poor judgment for which we cannot fairly punish the prosecution. He could have told the deputies the magazine contained loose documents without in any way disclosing the confidential nature or contents of those documents. Instead, he affirmatively created the impression that the important legal "material" in question was an article in Playboy. The deputies' amused and incredulous reaction was reasonable and foreseeable.

In *Bellizzi* v *Superior Court* (1974) 12 Cal.3d 33, 36-37 [115 Cal.Rptr. 52, 524 P.2d 148], the People's failure to comply with a pretrial discovery order led to dismissal of charges. The defendant told a defense witness of the dismissal, whereupon the witness left town. The People then refiled the charges. Our Supreme Court held defendant could not obtain dismissal of charges on the basis the prosecution's conduct had made a key witness unavailable. The defendant should have realized the prosecution might appeal the dismissal order or refile charges, and made sure he could contact the witness if necessary; defendant's negligence was largely responsible for that witness's unavailability. The same reasoning applies here. If defendant had managed to lose crucial documents *without* involving county employees acting in good faith, we would not be expected to dismiss charges or apply other sanctions. We find the facts before us essentially indistinguishable from such a case.

As an alternative to dismissal, defendant requested the jury be instructed as to the loss of the documents. The requested instruction would have informed the jury that defendant had collected documents he believed established alibis to several of the charged offenses; that these documents had been placed in a periodical which was seized from defendant's cell over his objections; and that the documents were missing when the periodical was returned. Such corrective instructions can be an appropriate remedy for certain *Hitch/Trombetta* due proces violations. (*People* v. *Zamora* (1980) 28 Cal.3d 88, 93, 102-103 [167 Cal.Rptr. 573, 615 P.2d 1361].) As we find no such violations, we find no error in the failure to give the requested instruction. We note in addition that there is no indication the defense was prevented from presenting to the jury evidence of the existence, confiscation and loss of documents; the prosecution suggested and expected the defense would present such evidence.

## C. *Motion to Recuse District Attorney's Office*

■ Penal Code section 1424 provides that a motion to disqualify a district attorney from prosecuting a criminal case "shall not be granted unless it is shown by the evidence that a conflict of interest exists such as would render it unlikely that the defendant would receive a fair trial." *People* v. *Conner* (1983) 34 Cal.3d 141, 148 [193 Cal.Rptr. 148, 666 P.2d 5] held that a "conflict" exists when "the circumstances of a case evidence a reasonable possibility that the DA's office may not exercise its discretionary function in an evenhanded manner." ■ The evidence here established no such conflict.

The fact that pretrial proceedings gave the district attorney's office information useful in presenting its case does not make recusal necessary. *People* v. *Partlow* (1978) 84 Cal.App.3d 540, 557 [148 Cal.Rptr. 744] upheld denial of a motion to recuse a district attorney who had helped set up the charged burglary, participated in a stakeout of the burgled premises, witnessed the burglary, and suggested a meeting between the defendant and a government informant. The information the district attorney in the case before us gleaned from defendant's motion to dismiss pales by comparison with the *Partlow* district attorney's extensive personal knowledge of the charged offense.

## D. *Application for Factual Determinations*

We need not decide whether an appellate court may make factual determinations in a criminal appeal, as the trial court made all findings necessary to our decision. We deny defendant's application for additional factual determinations.

## II. *Refusal to Participate in Lineup*

### A. *Admission of Evidence of Refusal*

■ A suspect's refusal to participate in nontestimonial evidence gathering procedures such as lineups may be used against him in court. (*People* v. *Ellis* (1966) 65 Cal.2d 529, 537-538 [55 Cal.Rptr. 385, 421 P.2d 393]; *People* v. *Smith* (1970) 13 Cal.App.3d 897, 910 [91 Cal.Rptr. 786, 52 A.L.R.3d 875].) Evidence of such a refusal is admissible even if the police misled the suspect as to the consequences of refusing. (*People* v. *Roach* (1980) 108 Cal.App.3d 891, 894 [166 Cal.Rptr. 801].)

Defendant's refusal is no more or less probative because an inexperienced attorney, rather than the police, misled him as to the appropriateness of

refusal. Nor does the conduct of the police merit any sanction; they warned him explicitly that the prosecution could present evidence of, and comment upon, his refusal.

The judge decided the evidence was more probative than prejudicial, and left it to the jury to determine defendant's motives after hearing a complete account of the circumstances. ■ Defendant contends the judge abused his discretion under Evidence Code section 352. He further contends admission of this evidence violated his constitutional right to counsel, in that he was penalized for following his attorney's advice.

The judge properly allowed evidence of and comment on defendant's initial refusal to participate, before his attorney arrived. Defendant has made no showing, and the record contains no suggestion, that this initial refusal was based on a desire to consult with an attorney before taking any irrevocable steps; use of defendant's refusal against him did not, therefore, impinge on defendant's right to counsel. (See *People* v. *Marx* (1975) 54 Cal.App.3d 100, 113 [126 Cal.Rptr. 350, 77 A.L.R.3d 1108].) Moreover, because this refusal was defendant's own idea, its probative value is clear.

The probative value of defendant's subsequent refusal, following his attorney's advice to refuse, is more questionable; however, the prejudicial effect of that evidence, when the circumstances of the refusal are explained, is substantially less than in the case of the initial refusal. We do not see a clear abuse of discretion in the balance the judge struck. As for the impact of admitting this evidence on defendant's right of counsel, we have seen no cases discussing the use against a defendant of his conduct based on counsel's erroneous advice. There are authorities holding a defendant's silence in the face of accusations, maintained upon the advice of counsel, cannot be introduced against him. (*People* v. *Ridley* (1965) 63 Cal.2d 671, 676 [47 Cal.Rptr. 796, 408 P.2d 124]; *People* v. *Abbott* (1956) 47 Cal.2d 362, 373-374 [303 P.2d 730]; *People* v. *McGee* (1947) 31 Cal.2d 229, 239-240 [187 P.2d 706].) While somewhat suggestive, these cases are distinguishable in key respects, involving as they do a defendant's privilege against self-incrimination, a privilege this defendant could not legitimately invoke to refuse the lineup. We need not decide if admission of defendant's latter refusal infringed on his right of counsel. Even if admission of this evidence was improper, the error was harmless beyond a reasonable doubt. Since defendant's initial, more probative refusal was properly admitted, it is extremely unlikely that evidence of the later refusal had a significant unfavorable impact. On the contrary, the account of the attorney's good faith advice not to participate, and defendant's reliance on that advice, almost certainly helped defendant by making his initial refusal look less suspicious. As noted

below, the judge's instructions to the jury constituted a further safeguard against prejudice.

### B. *Jury Instruction re Consciousness of Guilt*

 Defendant contends the judge erred in instructing the jury that if it found defendant attempted to suppress evidence by refusing to appear in a lineup, or by a deliberate attempt to alter his appearance, such conduct could be considered as a circumstance tending to show consciousness of guilt.

Before a jury may be instructed that it may draw a particular inference, there must be evidence in the record which, if believed, will support that inference. (*People* v. *Hannon* (1977) 19 Cal.3d 588, 597 [138 Cal.Rptr. 885, 564 P.2d 1203].) The evidence that defendant refused to take part in a lineup would support the inference he attempted to suppress evidence if the jury declined to accept defendant's version of his motives for refusing. The evidence that he shaved his distinctive moustache while the prosecution was obtaining a court order for a lineup not only supports such an inference, but strongly suggests it is the correct one.

We commend the trial court's taking care, in modifying CALJIC No. 2.06 for the occasion, to remind the jury that defendant's motives in refusing the lineup were in dispute.

### III. *Clarification of Ruling on Motion to Suppress*

 Defendant contends the court either granted his motion to suppress evidence flowing from his arrest and then summarily changed its mind, or failed to rule on that aspect of his motion and then denied it without following proper procedures. The record supports neither interpretation.

Both the court's spoken ruling and the minute order make sufficiently clear the court's decision to suppress items seized in the residential search and only those items. Had the court been presented with the actual wording of its ruling or of the minute order, rather than a partisan summary of same, we doubt the court would have seen any need to amend its order nunc pro tunc.

At most, the order, as uttered or entered, was ambiguous. Clarification of an ambiguous order nunc pro tunc is proper. (See *Estate of Careaga* (1964) 61 Cal.2d 471, 478 [39 Cal.Rptr. 215, 393 P.2d 415].)

## IV. *Merits of Denying Motion to Suppress Evidence Flowing From Arrest*

 Defendant points to two deficiencies in the affidavit on the basis of which the magistrate issued the arrest warrant. The first is the failure to inform the magistrate that the police believed the May 28 robbery to be one of a string of robberies perpetrated by the same person, and that witnesses to several of these other robberies did not identify defendant in photographic lineups; the second, the lack of any explicit statement that the photograph identified by the witnesses to the May 28 robbery was a photograph of defendant. (The photographic lineup itself was not incorporated in the affidavit.)

The federal standard for reviewing *misstatements* in the affidavit is set forth in *Franks* v. *Delaware* (1978) 438 U.S. 154, 171-172 [57 L.Ed.2d 667, 682, 98 S.Ct. 2674]. Since the passage of Proposition 8, we are bound by federal standard in determining whether evidence must be suppressed as a result of deficient support for the warrant. (*People* v. *Mayer* (1987) 188 Cal.App.3d 1101, 1120 [233 Cal.Rptr. 832]; *People* v. *Lopez* (1985) 173 Cal.App.3d 125, 132, 135 [218 Cal.Rptr. 799].) The courts have generally applied *Franks* to omissions as well as misstatements. (See, e.g., *People* v. *Crabb* (1987) 191 Cal.App.3d 390, 393, fn. 3 [236 Cal.Rptr. 385]; *People* v. *Mayer, supra*; *People* v. *Lopez, supra*.) We are also guided by *People* v. *Kurland* (1980) 28 Cal.3d 376, 384-391 [168 Cal.Rptr. 667, 618 P.2d 213], at least to the extent it is consistent with *Franks*. (See *People* v. *Crabb, supra; People* v. *Mayer, supra;* see also *People* v. *Siripongs* (1988) 45 Cal.3d 548, 570 [247 Cal.Rptr. 729, 754 P.2d 1306], discussing the omissions issue entirely on basis of *Kurland* with no reference to *Franks*.)

 We must first determine if the omitted facts were material: i.e., "if their omission would make the affidavit *substantially misleading . . .* if, because of their inherent probative force, there is a substantial possibility they would have altered a reasonable magistrate's probable cause determination." (*People* v. *Kurland, supra,* 28 Cal.3d at p. 385, original italics.) We do not believe the failure of witnesses to the similar robberies to identify defendant meets this standard of materiality. If other witnesses to the *same* robbery had identified another photograph or failed to identify any, omission of that information might well be "substantially misleading." (See the analogous holding in *People* v. *Kurland, supra,* 28 Cal.3d at p. 395, that where the affidavit relates specific instances of an informant's reliability, it should include equally specific instances where informant did not prove reliable.) The situation here is quite different. Two witnesses to the May 28 robbery, including a victim, identified defendant's photograph as that of the

robber.[6] The probative value, as to the May 28 robbery, of the reactions of victims of other robberies was minimal. The theory that one robber perpetrated all the robberies was speculation. If the magistrate had been presented with this information, he would have been more likely to regard it as weighing against the one-robber theory than as negating probable cause on the May 28 robbery.

Even if we regarded the omitted facts as material, their omission would not justify traversing the warrant. Under *Franks,* a warrant may be deemed void for material misstatement in the affidavit only where the misstatement is necessary to any finding of probable cause, and was made in order to deceive or with reckless disregard for the truth. Innocent mistake or negligent misrepresentation will not invalidate the warrant. (*Franks* v. *Delaware, supra,* 438 U.S. at p. 17 [57 L.Ed.2d at p. 682].) At least one case has held the same principle applicable to negligent omission of facts. (*People* v. *Lopez, supra,* 173 Cal.App.3d 125, 135.) We see no justification for treating negligent misrepresentation and negligent omission of facts differently. As defendant has made no showing that the officer who obtained the warrant, Deputy Carlander, intended to deceive the court or acted recklessly in failing to include identification data on other similar robberies, the warrant must stand.

We would reach the same result under *Kurland*'s somewhat different treatment of negligent omissions. *Kurland* places a burden on the People to show the omission of a material fact was reasonable. If the People do not make this showing, the omitted information is added to the affidavit and the corrected affidavit retested for probable cause. (*People* v. *Kurland, supra,* 28 Cal.3d at pp. 388, 390.) Even if Carlander acted unreasonably in omitting this information, its inclusion in the affidavit would not so undercut the May 28 victims' identification as to render a finding of probable cause untenable.

Under either test, the inadvertent omission of the photographic lineup and related information does not invalidate the warrant. There was no showing and no likelihood this information was omitted with deceptive intent or reckless disregard for the truth. We must either ignore this, at most, negligent omission under *Franks,* or treat the information as if included under *Kurland.* In either case, the warrant stands.

Finally, the admissibility of evidence seized pursuant to arrest does not depend on the validity of the arrest warrant per se, but on the validity of

---

[6] The other victim in that robbery was Ralph Nau. There is no indication in the record that Nau was shown any photographs before the police obtained the arrest warrant. Nau viewed a photographic lineup subsequent to defendant's arrest. Contrary to the statement in defendant's opening brief, Nau identified defendant in the photographic lineup.

the arrest. If the police had probable cause to arrest without a warrant, deficiencies in the warrant do not render the arrest, and any search incident to arrest, illegal. (*People* v. *Kirk* (1974) 43 Cal.App.3d 921, 926 [117 Cal.Rptr. 345]; *People* v. *Rice* (1970) 10 Cal.App.3d 730, 737 [89 Cal.Rptr. 200].) We find the police had probable cause for this arrest. Information from an untested confidential informant, corroborated in essential respects by other facts and circumstances, establishes probable cause for arrest. (*People* v. *Lara* (1967) 67 Cal.2d 365, 374-375 [62 Cal.Rptr. 586, 432 P.2d 202]; *People* v. *Bigham* (1975) 49 Cal.App.3d 73, 77 [122 Cal.Rptr. 252].) Information supplied by the victim of a crime, including photographic identification, is presumed reliable. (*People* v. *Hogan* (1969) 71 Cal.2d 888, 890 [80 Cal.Rptr. 28, 457 P.2d 868]; *People* v. *Spencer* (1972) 22 Cal.App.3d 786, 795 [99 Cal.Rptr. 681].) By themselves, the two witnesses' photographic identifications of defendant would probably have sufficed, even if not made with utter certainty (*People* v. *Sullivan* (1967) 255 Cal.App.2d 232, 235-236 [62 Cal.Rptr. 887]). Those identifications, coupled with the witnesses' descriptions of the robber and the confidential informant's tip, constituted ample probable cause to arrest defendant. (See *People* v. *Amos* (1977) 70 Cal.App.3d 562, 566-567 [139 Cal.Rptr. 30].)

## V. *Motion to Suppress Bank Records*

### A. *Investigator's Use of Suppressed Checks*

 Defendant contends the district attorney's investigator used the checks found in the Clark residence to locate the bank branch at which defendant had an account, and that the court was therefore obliged to suppress all evidence obtained from that branch, specifically the records acquired pursuant to the search warrant served on the branch.

 If the prosecution obtains evidence, or information leading to evidence, from both a tainted source and an independent untainted source, the evidence is admissible. (*Nardone* v. *United States* (1939) 308 U.S. 338, 341 [84 L.Ed. 307, 311-312, 60 S.Ct. 266].) Similarly, the evidence is admissible if under all the circumstances, the People could have been expected to discover the evidence even without use of the tainted material. (*Nix* v. *Williams* (1984) 467 U.S. 431, 446-448 [81 L.Ed.2d 377, 389-390, 104 S.Ct. 2501]; *Lockridge* v. *Superior Court* (1970) 3 Cal.3d 166, 170 [89 Cal.Rptr. 731, 474 P.2d 683].) The test, as to the likelihood of eventual discovery, is not one of certainty, but rather of a reasonably strong probability. (*Hernandez* v. *Superior Court* (1980) 110 Cal.App.3d 355, 364 [185 Cal.Rptr. 127]; *People* v. *Superior Court* (*Tunch*) (1978) 80 Cal.App.3d 665, 681 [145 Cal.Rptr. 795].)

 Here, the prosecution knew of defendant's connection to Julian, California before police searched Clark's Julian residence and before defendant's arrest. Julian is a very small town; its population is less than five hundred, its business district one or two blocks long. It has only two banks. Once defendant was placed in the small town of Julian, discovery of his bank account there was to be expected. Indeed, the investigator testified he would also have gone to Julian's other savings institution, Home Savings and Loan, if he had known of its existence. Moreover, the validly seized Back Country business card found in defendant's wallet upon his arrest revealed the business's existence; normal police work would have led to the business's location, and hence to its bank account in Julian.

### B. *Financial Privacy Act*

 Defendant argued in the trial court that bank employees violated the California Right to Financial Privacy Act (Gov. Code, § 7460 et seq.) by describing to the investigator, from memory, various deposits defendant had made. The court held such conduct did not violate the act.

The bank kept at least temporary records of the dates of deposits and the nature (check v. cash, even paper money v. coin) of those deposits. Government Code section 7470, subdivision (a) indicates the Financial Privacy Act covers information contained in a customer's financial records. The bank employees, in discussing the frequency and composition of defendant's cash deposits, related information of a type typically contained in this bank's records. They disclosed this information without requiring the investigator to follow the procedures mandated in Government Code section 7471 et seq. There is, however, no indication the employees based their comments in any way on the bank's records, as opposed to their own independent recollection of events. We need not decide whether independent recollections of information also contained in bank records are covered by the Financial Privacy Act. Violations of the act do not necessitate exclusion of resulting evidence.

Article I, section 28 of the California Constitution provides that relevant evidence shall not be excluded except where federal constitutional guaranties or state statutory privileges require exclusion. The federal Constitution does not create a right of privacy for bank records. (*United States* v. *Miller* (1976) 425 U.S. 435, 442-443 [48 L.Ed.2d 71, 79, 96 S.Ct. 1619].) Nor does the Financial Privacy Act establish a statutory *privilege* as article I, section 28 uses that term; it merely institutes a *procedure* regulating the circumstances under which bank records will be disclosed. (*People* v. *Gibson* (1987) 195 Cal.App.3d 841, 853-854 [241 Cal.Rptr. 126].)

## VI. *Sentencing*

### A. *Alleged Use of Defendant's Refusal to Plead Guilty*

 Defendant contends the court imposed a severe sentence to punish him for insisting on a jury trial. There is no evidence in any part of the record supporting this claim. Defendant's assertion to this effect in an unsworn paper filed below is not evidence. As noted below, the trial court stated ample reasons for its sentencing choices. We will not assume the trial court used the stated reasons to mask a hidden unconstitutional agenda. (See *People* v. *Szeto* (1981) 29 Cal.3d 20, 35 [171 Cal.Rptr. 652, 623 P.2d 213].) The length of the sentence, under all the circumstances, does not compel a finding either of improper sentencing criteria or of abuse of discretion.

### B. *Double Use of Sentencing Factors*

 The court's stated reasons for imposing the upper base term, summarized above, paralleled many of the "circumstances in aggravation" set forth in California Rules of Court, rule 421 (see rule 421(a)(1), (2), (4), (8); rule 421(b)(2), (4)). Similarly, the court's stated reasons for imposing consecutive sentences tracked California Rules of Court, rule 425(a)(2), (3), (4) and (5) (criteria affecting decision to impose consecutive rather than concurrent sentences).

While the court erred in using certain factors to justify both the upper base term and the consecutive sentences (i.e., numerous offenses, multiple victims), the error was harmless, given the adequate additional reasons stated as to both sentencing choices. It is not reasonably probable the court would have sentenced defendant differently if it had considered the factor of numerous offenses only to impose consecutive sentences, and the multiplicity of victims only to aggravate the sentence. Were we to remand, the court could simply omit reference to these factors in justifying one or the other sentencing choice. Such an exercise is unnecessary. (*People* v. *Skenandore* (1982) 137 Cal.App.3d 922, 925 [187 Cal.Rptr. 368]; see also *People* v. *Williams* (1986) 180 Cal.App.3d 57, 62 [225 Cal.Rptr. 498].)

The court's phrasing as to the exceptional threat of great bodily injury posed by defendant's actions suggests the court may have used defendant's firearm use to aggravate the sentence as well as to impose enhancements, in violation of Penal Code section 1170, subdivision (b) and California Rules of Court, rule 441(c). Even if the court did so, and even if defendant has not waived the issue by failing to assert it on appeal, we hold the error was harmless, for the same reasons indicated above: The court had adequate

proper reasons to aggravate the sentence without the firearm use, and would probably have imposed the aggravated sentence if the firearm use had not been considered.

### VII. *Effect of Los Angeles County Dismissal*

 Defendant contends the Los Angeles Superior Court's dismissal of charges, subsequent to his Orange County conviction, bars the Orange County conviction as a matter of collateral estoppel. While this sequence of events suggests the jurisprudence Alice encountered in Wonderland, it is indeed the rule in California that a subsequent final judgment, never appealed, can have res judicata or collateral estoppel effect over an earlier judgment whose appeal is still pending. (*Domestic & Foreign Pet. Co., Ltd.* v. *Long* (1935) 4 Cal.2d 547, 562 [51 P.2d 73]; *Baughman* v. *State Farm Mut. Auto Ins. Co.* (1983) 148 Cal.App.3d 621, 624-625 [196 Cal.Rptr. 35]; *Eichler Homes, Inc.* v. *Anderson* (1970) 9 Cal.App.3d 224, 232-233 [87 Cal.Rptr. 893]; see also *Agarwal* v. *Johnson* (1979) 25 Cal.3d 932, 954, fn. 11 [160 Cal.Rptr. 141, 603 P.2d 58].)

 Collateral estoppel bars relitigation of an issue decided at a previous (or previously final) proceeding only if: (1) the issue was actually litigated and necessarily decided at the previous proceeding; (2) the issue so litigated and decided is identical to the issue currently before the court; (3) the previous proceeding resulted in a final judgment on the merits; and (4) the party against whom collateral estoppel is asserted was a party to, or in privity with a party to, the previous proceeding. (*People* v. *Sims* (1982) 32 Cal.3d 468, 484 [186 Cal.Rptr. 77, 651 P.2d 321]; *People* v. *Taylor* (1974) 12 Cal.3d 686, 691 [117 Cal.Rptr. 70, 527 P.2d 622].) We must therefore consider if the Los Angeles judgment meets these criteria as to the issue of defendant's entitlement to *Hitch/Trombetta* sanctions in Orange County.

Defendant's *Hitch* motions in both courts were based on the loss of alibi documents. Loss of alibi documents pertaining to the Los Angeles charges could only raise issues identical to those involved in defendant's defense against the Orange County charges to the extent the two sets of charges concerned overlapping dates. Where the charges concern different dates, the issues *Trombetta* requires the trial court to determine—apparent exculpatory value of the lost documents and availability of comparable evidence—cannot be identical. Only one date appears in both sets of charges: July 25, 1983. Thus, any collateral estoppel effect of the Los Angeles judgment would extend only to defendant's conviction of the July 25 robbery. We have concluded, however, that neither *Hitch* dismissals in general nor the Los Angeles court's order in particular have the collateral estoppel effect urged by defendant.

We have found no reported decisions discussing whether a *Hitch* dismissal may be considered a "final judgment on the merits" having binding collateral estoppel effect. After considering the nature of such a ruling, and the effect given analogous rulings, we conclude it may not. Findings made on a Penal Code section 1538.5 motion to dismiss are not binding on a court considering dismissal of different charges based on different crimes. (*People v. Gephart* (1979) 93 Cal.App.3d 989, 998-999 [156 Cal.Rptr. 489]; see also *People v. Brewster* (1986) 184 Cal.App.3d 921, 928-929 [229 Cal.Rptr. 352]; *People v. Williams* (1979) 89 Cal.App.3d 1026, 1032 [152 Cal.Rptr. 892].) We see no justification for applying a different rule to nonstatutory motions to dismiss. The constitutional basis of *Hitch* motions is not a distinguishing factor: Section 1538.5 motions are based on alleged violations of constitutional rights, those concerning search and seizure. In another analogous situation, when a trial court dismisses a felony action in the interests of justice pursuant to Penal Code section 1385, the dismissal does not prevent refiling and litigation of the same charges: only a second refiling is prohibited. (Pen. Code, § 1387.) Section 1385 dismissals often appear indistinguishable from nonstatutory *Hitch* dismissals. (See, e.g., *People v. Mejia* (1976) 57 Cal.App.3d 574, 577, 581-583 [129 Cal.Rptr. 192] [dismissal after federal government deported witnesses at instigation of state authorities]; *People v. Davis* (1971) 20 Cal.App.3d 890, 893-895 [98 Cal.Rptr. 71] [trial court granted dismissal after prosecution suppressed evidence; remanded for further findings].)

At defendant's urging, we have obtained and reviewed a transcript of the arguments made before the Los Angeles judge in connection with the motion to dismiss, and the judge's ruling thereon. We do not say the judge's "findings," as the judge explicitly declined to make any. His reasons for declining to make findings are illuminating: "[T]he court [is] declining to make any findings at this time, primarily because of the fact that according to my understanding *the Orange County case is still going through the appellate process . . . so without making any findings and without saying anything that may prove to be prejudicial or beneficial to that case,* the court is going to grant the motion to dismiss." (Italics added.)

We could hardly ask for a clearer statement that the Los Angeles order was meant to have no collateral estoppel or other effect beyond the immediate context. Moreover, if the court expressly refrains from determining an issue, no collateral estoppel results as to that issue. (*Clovis Ready Mix Co. v. Aetna Freight Lines* (1972) 25 Cal.App.3d 276, 284 [101 Cal.Rptr. 820]; *Bleeck v. State Board of Optometry* (1971) 18 Cal.App.3d 415, 429 [95 Cal.Rptr. 860].) The Los Angeles court decided no factual issues in connection with its order. Indeed, the district attorney essentially asked the court to *assume,* for the purposes of the motion, that the lost evidence was materi-

al and exculpatory, and the court did so. The district attorney felt obliged to proceed in this manner because the judge heard some evidence on these issues in camera, with no representative of the People present. If the court *had* made factual findings based in part on the evidence heard in camera, we would question whether the People had had the fair opportunity to litigate the factual issues addressed in such findings, necessary for collateral estoppel effect. (See *Mueller* v. *J. C. Penney Co.* (1985) 173 Cal.App.3d 713, 720 [219 Cal.Rptr. 272].)

We also note that while the judge at one point indicated defendant had established "relevancy" and certain other facts by a preponderance of the evidence, the judge made other comments similar to our own reasons for affirming denial of the Orange County motion to dismiss. The judge opined that much of the missing evidence could be reconstructed or equivalent secondary evidence introduced, and that defendant's actions in keeping such documents in his cell in a Playboy magazine contributed to his misfortune. The judge also declined to sign an order whose language suggested the state was at fault in the disappearance of the documents.

There is thus no legal or factual basis for defendant's contention the Los Angeles ruling requires dismissal of the Orange County action.

The judgment is affirmed.

Crosby, J., and Blanpied, J.,* concurred.

Appellant's petition for review by the Supreme Court was denied August 9, 1989.

---

* Assigned by the Chairperson of the Judicial Council.