Filed 10/5/22  P. v. Scott CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

|  |  |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>TERRENCE MARZET SCOTT,<br><br>    Defendant and Appellant. | D078986<br><br><br><br>(Super. Ct. No.  FVI18002863) |

APPEAL from a judgment of the Superior Court of San Bernardino County, Michael A. Camber, Judge.  Affirmed and remanded with directions.

C. Matthew Missakian, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters and Melissa Mandel, Assistant Attorneys General and Teresa Torreblanca, Deputy Attorney General for Plaintiff and Respondent.

A jury convicted Terrence Marzet Scott of first degree murder (Pen. Code,[1] § 187, subd. (a)) and found true allegations that he personally used, and personally and intentionally discharged, a firearm causing death (§ 12022.53, subds. (b), (c), & (d)). It found true allegations that Scott had served two prior prison terms. (§ 667.5, subd. (b).)

The trial court sentenced Scott to 50 years to life: 25 years to life for the murder plus 25 years to life for personally discharging a firearm causing death. (§ 12022.53, subd. (d).)

Scott contends the court erroneously: (1) denied his motion to quash the warrant to search his home; (2) admitted testimony that an unidentified analyst had "conducted the same comparison" and "verified" a criminalist's analysis of the murder weapon; and (3) admitted police officers' testimony ruling out as the perpetrators other individuals they investigated. He further contends: (4) insufficient evidence of premeditation and deliberation supported his first degree murder conviction; (5) the prosecutor committed misconduct during closing arguments to which defense counsel failed to object, constituting ineffective assistance; and (6) the court imposed a $10,000 restitution fine because it was mistaken about its discretion.

The People concede that the restitution claim is meritorious. We agree, affirm the convictions, and remand with directions.

---

[1] Undesignated statutory references are to the Penal Code.

2

FACTUAL AND PROCEDURAL BACKGROUND

*The Victim's Death*

The victim, Shirley Stewart, was 77 years old and needed help caring for herself. On February 8, 2016, at approximately 9:00 a.m., her hired certified home health aide (the aide) went to Stewart's apartment to help her. When the aide left the apartment at approximately 10:00 a.m., Stewart was connected to an oxygen tank. Stewart told the aide to leave the front door unlocked because a nurse was scheduled to visit Stewart shortly.

The nurse arrived at Stewart's apartment at approximately 12:50 p.m., and found Stewart on the floor and her oxygen turned off. He could not detect a pulse, a heartbeat or respiration and called 911.

San Bernardino County Sheriff's deputies arrived at the scene and concluded Stewart had been shot four times. They detected no gunshot residue or stippling nearby, indicating the gun was fired from at least two feet away. They found four cartridge cases in the living room close to Stewart's body and a bullet inside her apartment wall. An additional bullet was later located in the apartment. The pathologist recovered two bullets during the autopsy.

The day after the murder, a sheriff's deputy contacted Scott. Gunshot residue was found on the top of Scott's sandals, indicating he was possibly around a firearm discharge or had contact with gunshot residue.

Pursuant to a search warrant, police searched the home where Scott lived with his parents and sister and found a Ruger nine-millimeter firearm belonging to Scott's father in the master bedroom under a mattress. A mixture of DNA from three people, including Scott, was found on the firearm.

3

The magazine could hold 10 cartridges, but only contained six. Police determined that the four expended cartridges found in Stewart's apartment, as well as the four bullets collected from Stewart's body and her apartment, were fired from that Ruger firearm.

Scott's girlfriend visited Scott's residence around 10:30 or 11:00 a.m. on the day of the murder, but she did not find him at home. Scott's home was located 1.1 miles from Stewart's apartment.

*Scott's Earlier Actions*

In November 2014, a San Bernardino County Sheriff's deputy responded to a call that Scott was in the vicinity of Stewart's apartment. A deputy testified he observed Scott, who appeared very angry, pacing outside Stewart's apartment and clenching his fist. Scott told the deputy that he had been kicked out of Stewart's apartment and his belongings were still inside. The deputy knocked on the door, and Stewart was shaking. She explained she had allowed Scott to live with her, but now wanted him to take his belongings and leave. The deputy escorted Scott into the apartment for that purpose, and afterwards escorted him out.

M.M. testified that in December 2015, while she was collecting cans in a dumpster area in Stewart's apartment complex, Scott told her, "I'm going to kill this bitch." M.M. asked, "Who? What happened?" Scott, pointing in the direction of Stewart's apartment, responded, "I'm going to kill this bitch right here. She's a fucking witch." Scott always referred to Stewart as a witch, and M.M. knew Scott and Stewart were always arguing with each other.

Stewart's aide testified that about a year before Stewart's death, Scott appeared at Stewart's apartment and Stewart asked the aide to make him

4

leave. About six months later, when Scott returned to Stewart's apartment, Stewart told the aide not to let him in, and to tell him not to come around anymore. The aide informed the apartment manager's office, and at some point was advised to call the police if Scott returned.

*Defense Case*

Scott testified he first knew Stewart in 2013 or 2014, and they had a good relationship. He once told Stewart he loved her. He agreed Stewart was kind and generous. Scott stayed on Stewart's couch on the night before his grandmother's funeral. The next day, Stewart gave him the cab fare to go to that funeral.

Scott testified that when he started "venting" and said, "I can't stand this bitch," he was referring not to Stewart, but to his girlfriend, whose actions bothered him. Scott denied threatening to kill anyone.

Scott testified that on a couple of occasions he went shooting at a range and used his father's gun. Also, he occasionally carried the gun around the house "like a dumb ass in front of [his] friends."

Scott testified that on the day of the shooting, he was at home sleeping until his mother returned from work and woke him up at approximately 1:00 p.m.

Scott denied having anything to do with Stewart's death. He admitted he was previously convicted for possession for sale of cocaine base and possession of a stolen vehicle.

Scott's father testified he owned the gun used in the crime and kept it under his mattress or in a lounge chair. Scott, his father, and his brother all

testified that, at some unspecified time earlier, Scott had gone to the shooting range and fired the gun.

*Rebuttal Evidence*

On rebuttal, a sergeant testified that on the day of the murder, Scott's father claimed not to have fired the murder weapon "for years," and also said that the "ammunition was over 10 years old and the magazine was fully loaded."

DISCUSSION

I. *Search Warrant*

Scott contends the trial court erroneously declined to quash and traverse the search warrant and suppress the firearm seized during the search of his residence. He specifically argues the sergeant's "purported probable cause in support of the warrant was entirely circumstantial." Scott adds: "Nobody had seen [him] on the day of the shooting and there was no forensic evidence connecting him to the crime. [He] was a suspect merely because he had been identified as a nuisance who had annoyed and perhaps frightened Stewart. [¶] Assuming the affidavit made a showing of probable cause, that showing was weak. Had the affidavit disclosed facts related to the credibility of [the aide], who provided almost all the basis for suspecting [him], and had it been truthful about the staleness of the reports about [his] interactions with Stewart, probable cause could not have been found."

Scott further contends that the aide's "credibility was obviously crucial, yet [the sergeant] did not allow the magistrate to consider [that the aide] had agreed to lie about how she recorded her time card to her employer. And, critically, [the sergeant] did not disclose that a neighbor who was

6

familiar with [the aide] thought he saw her car parked *after* hearing gun shots [near Stewart's apartment]." Scott contends, "These disclosures could justifiably have led the magistrate to discount [the aide's] claims entirely."

A. *Background*

    1. *The Sergeant's Statement of Probable Cause in the Search Warrant*

The Sergeant stated in the search warrant that on February 8, 2016, Stewart was unattended from 10:00 a.m. when the aide left Stewart's apartment until 1:00 p.m. when the nurse arrived and found her unresponsive. The nurse told police at the scene that the aide had not disclosed anything unusual about Stewart or her health. Police saw "no obvious signs of trauma to [her] body in the position that she lay in the apartment." They found four fired cartridges near her body. The apartment did not appear to be ransacked, and there were no signs of a struggle or property missing.

The sergeant wrote: "A deputy spoke to a nearby neighbor, who reported hearing loud banging noise coming from the apartment. The neighbor stated it could have been gunshots he heard after he learned that someone was shot. [¶] During neighborhood contacts it was learned that a black male adult had been seen around Stewart's apartment on multiple occasions. [A detective] contacted [K.L., a maintenance employee] at the apartment complex, [who] said [Scott was] a nuisance around the complex, had harassed the employees in the office, and had been told to stay away from Stewart's apartment and out of the complex. [K.L.] had seen Scott outside Stewart's apartment within the last thirty days."

7

The sergeant wrote what the aide told police about Stewart's dealings with Scott: "Stewart met Scott as Scott was sitting on the stairs outside of Stewart's apartment. Scott would come by Stewart's apartment and Stewart would provide food and conversation. Stewart became increasingly nervous about Scott's behavior. [The aide] (a self-admitted recovering drug addict) believed Scott was using drugs due to his mannerisms and associations to other subjects in the complex whom [the aide] believed were selling and using drugs. At one point, Scott came to Stewart's apartment and she let him inside. Scott began to say strange things such as Stewart was 'not going to need her oxygen' and if Stewart locked Scott out, he 'would break the door down.' Stewart was eventually able to get Scott outside the apartment and Scott left the location.' [¶] On the morning of [ ] February 8, 2016, Stewart told [the aide that] Scott tried to knock on Stewart's front door around [12:30 a.m.] Stewart did not answer the door, but saw Scott through the peephole, walking away from Stewart's apartment." The sergeant wrote that Stewart's criminal history included multiple charges related to narcotics, property crimes, and probation violations.

   2. *Scott's Motion to Quash the Search Warrant*

Before trial, Scott moved under section 1538.5 to traverse and quash the search warrant that led to the search of his home and seizure of the gun from his residence. Scott argued the detective's search warrant's affidavit included such false or misleading information as: (1) That "the victim was left unattended from around [10:00 p.m.] and [1:00 a.m.]"; (2) A deputy "spoke to a neighbor who reported hearing loud banging noise coming from the apartment. The neighbor stated it could have been gun shots he heard after

8

her [*sic*] learned that someone was shot"; (3) "During neighborhood contacts it was learned that a black male [Scott] had been seen around Stewart's apartment on multiple occasions"; (4) "[K.L.] had been seen Scott [*sic*] outside Stewart's apartment within the last 30 days"; and (5) "At one point, Scott came to Stewart's apartment and she let him inside. Scott began to say strange things such as Stewart was 'not going to need her oxygen' and if Stewart locked Scott out, he would 'break the door down.' " (Italics omitted.)

Scott also claimed the sergeant omitted matters from the affidavit, including that "[the nurse and the aide] lied to deputies regarding the timing of when they attended to the victim on the incident date as well as the circumstances regarding the victim allegedly being left unattended" (some capitalization omitted); and, "Scott's mother . . . advised on the incident date when she left her residence the defendant was asleep inside his bedroom and when she returned several hours later he was still asleep in his bedroom."

In opposition, the People argued: "[Scott] has provided no offer of proof, nor any additional evidence or discovery to make a preliminary showing that any of the statements made by [the sergeant] in his declaration of probable cause were false or misleading. While [Scott] points to five specific statements and makes a conclusory declaration that the statements were false or patently misleading, [he] has not provided any corroboration to justify such a declaration. These statements were all derived from witness interviews conducted by homicide detectives and deputies during their initial investigation, and there has been no evidence provided by [Scott] that such statements were fabricated or inaccurate." (Some capitalization omitted.)

9

The People further argued: "[Scott] has also failed to meet [his] burden of proving by a preponderance of the evidence that the 'omissions' . . . [were] made knowingly or intentionally, or with reckless disregard for the truth, and that these 'omissions' were material facts that would have affected a showing of probable cause for the search warrant. Regarding [his mother's] statement that [Scott] was home prior to her leaving for work and was also at home when she returned several hours later, this fact is irrelevant because the hours when she was not at home were the hours when the murder occurred, and this fact is immaterial as to the probable cause analysis. While [Scott] points to omissions of facts pertaining to [the aide] in order to suggest that [the aide] should have also been considered a suspect, this omission does not affect the probable cause analysis regarding [Scott] or preclude him as a suspect. Based on their training and experience, and their investigation of the case, the detectives determined [the aide] was not a suspect in the murder of Ms. Stewart; however, even if the information regarding [the aide] WERE included in [the sergeant's] declaration of probable cause, there would still be a sufficient showing based on a totality of the circumstances set forth in the Declaration." (Some capitalization omitted.)

3. *Sergeant's Testimony at the Hearing on the Motion to Quash*

The sergeant testified the aide told him that although a supervising nurse was supposed to be at Stewart's apartment to observe the aide take care of Stewart, he did not arrive on time. Nevertheless, they agreed to report in their work logs that they were at Stewart's apartment at the same time. The sergeant knew about the aide's lie before he prepared the warrant.

10

However, he did not mention it in the affidavit, explaining that the aide had lied to her employer, but not to him.

The sergeant learned that the aide and Stewart had agreed that Stewart would give the aide money to buy groceries for Stewart, which was outside the scope of her duties.

The sergeant testified that he had no reason to believe the aide had lied to him about the information he included in the affidavit regarding Scott.

The sergeant knew when he wrote the warrant that a neighbor reported hearing loud bangs, looked out his window, and saw what he believed to be the aide's car, but he omitted it from the search warrant because the neighbor was vague "about how he was in the shower, and he went out to talk to his girl. He heard the gunshots. He was a little back and forth about those things."

The sergeant explained that according to Scott's mother, Scott's whereabouts were unaccounted for during a three-hour window between 10:00 a.m., when she left the house while Scott was asleep, and 1:00 p.m. when she returned.

4. *The Court's Ruling on the Motion*

The court denied Scott's motion to quash: "[I]t seems clear to the court that although [the aide] did prove to be disingenuous with the timeline, it was strictly to cover [the aide] and [the nurse's] bases with respect to liability regarding their caretaker responsibilities. So it wasn't so much to be disingenuous to the sergeant. [¶] So by that rationale, the court finds no impropriety with respect to the probable cause declaration. Not to mention

11

this, there are other corroborating factors leading the sergeant to place in the probable cause declaration the justification to search the home of Mr. Scott."

B. *Applicable Law*

" 'In reviewing a search conducted pursuant to a warrant, an appellate court inquires "whether the magistrate had a substantial basis for concluding a fair probability existed that a search would uncover wrongdoing." [Citations.] "The task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him [or her], including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place." [Citation.] The magistrate's determination of probable cause is entitled to deferential review. [Citations.]' [Citation.] Probable cause sufficient for issuance of a warrant requires a showing in the supporting affidavit that makes it substantially probable that there is specific property lawfully subject to seizure presently located in the particular place for which the warrant is sought." (*People v. Scott* (2011) 52 Cal.4th 452, 483.)

"A defendant has a limited right to challenge the veracity of statements contained in an affidavit of probable cause made in support of the issuance of a search warrant. The trial court must conduct an evidentiary hearing only if a defendant makes a substantial showing that (1) the affidavit contains statements that are deliberately false or were made in reckless disregard of the truth, and (2) the affidavit's remaining contents, after the false statements are excised, are insufficient to support a finding of probable cause. Innocent or negligent misrepresentations will not support a motion to

12

traverse. [Citations.] A defendant who challenges a search warrant based on *omissions* in the affidavit bears the burden of showing an intentional or reckless omission of material information that, when added to the affidavit, renders it insufficient to support a finding of probable cause. [Citations.] In either setting, the defendant must make his showing by a preponderance of the evidence, and the affidavit is presumed valid." (*Scott*, *supra*, 52 Cal.4th at p. 484.)

On appeal, "[w]e defer to the trial court's express and implied factual findings if supported by substantial evidence, but we independently determine the legality of the search under the Fourth Amendment." (*People v. Eubanks* (2011) 53 Cal.4th 110, 133.)

C. *Analysis*

Applying the above principles, we conclude the sergeant's affidavit supporting the search warrant contained sufficient information for the magistrate to conclude it was substantially probable that evidence of Stewart's murder would be found in Scott's residence. Specifically, as explained in sworn testimony regarding the information used to support the application for the search warrant, the police found Stewart dead and her oxygen turned off. The Sergeant learned that Scott had been seen around Stewart's apartment complex within the previous thirty days. Scott had threatened to break down the door to Stewart's apartment if she locked him out. Scott also said strange things like she was not going to need her oxygen. Moreover, the Sergeant knew that as recently as predawn of the morning when Stewart died, Scott went to Stewart's apartment.

13

We reject Scott's contention about the sergeant's asserted omissions of reasons to doubt the aide's credibility, namely her lie to her employer on the day of the murder, and the neighbor's observations that day. The trial court concluded these omitted facts would not have affected the issuance of the warrant because "there are other corroborating factors leading the sergeant to place in the probable cause declaration the justification to search [Scott's] home." We agree with the trial court that the omitted facts were not material because there is no "substantial possibility they would have altered a reasonable magistrate's probable cause determination," and their omission did not "make the affidavit[s] substantially misleading." (*People v. Kurland* (1980) 28 Cal.3d 376, 385.) Here, as in *People v. Bradford* (1997) 15 Cal.4th 1229, the magistrate "did not err in finding that, considered as amended to include the above described information, the affidavit[s] established probable cause." (*Id.* at p. 1299; see also *People v. Huston* (1989) 210 Cal.App.3d 192, 219–220.) Specifically, even assuming the magistrate was informed of the lie concocted by the aide and nurse regarding their time sheets, as the court stated, other aspects of the affidavit still supported a finding of probable cause.

Likewise, we agree with the People's argument regarding the sergeant's omission of the date regarding Scott's threats to Stewart, which Scott contends occurred in 2014: "Although the affidavit in this case was vague about when the threat took place, it established that [Scott] remained a threat to [Stewart] up until the day she died. [¶] Again, [Scott] had been told to stay away from [Stewart's] apartment and the apartment complex as a whole, but he had been seen outside [Stewart's] apartment within the thirty

14

days before her death. Moreover, according to [the aide, Stewart] had become *increasingly* nervous about [Scott's] behavior. And [Scott] had knocked on [Stewart's] front door just after midnight on the date of the murder."

Finally, even if the sergeant's omission of the neighbor's purportedly seeing the aide's car after he heard the loud bang were included in the affidavit, doing so would not undermine the other evidence that provided probable cause to search Scott's home. "An affidavit need not disclose every imaginable fact however irrelevant. It need only furnish the magistrate with information, favorable and adverse, sufficient to permit a reasonable, common sense determination whether circumstances which justify a search are probably present." (*People v. Sandoval* (2015) 62 Cal.4th 394, 410.) We also agree with the People's assessment of the sergeant's testimony at the motion hearing: "Although less than eloquent, it appears that the point [the sergeant] was trying to make at the hearing on the matter was that he did not have much confidence in the neighbor's claim because it was vague and inconsistent. . . . At most, [the sergeant's] omission of this information was negligent, which does not entitle [Scott] to any relief." We conclude the trial court properly denied Scott's motion to quash the warrant and suppress the items located during the search authorized by it.

## II. *The Criminalist's Testimony*

Scott contends the trial court improperly admitted testimony that an unidentified analyst had verified the findings of a criminalist, Christi Bonar, that the four cartridges and bullets collected in this case came from the gun found in Scott's home. Scott argues the testimony was hearsay, lacked foundation, and violated state law and the confrontation and due process

15

clauses of the federal and state Constitutions. He contends Bonar "made the specific claim that in this particular case, some other 'qualified analyst' verified that her conclusions were correct, both as to the cartridges and fired bullets. This was inadmissible hearsay under [*People v. Sanchez* (2016) 63 Cal.4th 665, 684 (*Sanchez*)]."

The People counter that there was no error, or alternatively, any error was harmless beyond a reasonable doubt: "Bonar personally performed the comparative analysis, testified extensively regarding that comparison, and was cross-examined about the basis for her opinion that the four cartridges and the four bullets collected in this case were fired from the firearm found in appellant's home. . . . [¶] Neither Bonar's testimony nor the prosecutor in closing argument disclosed the results of the second expert's testing (if such testing in fact occurred), only that the verification process had been conducted in accordance with lab policy. . . . There is thus no reason to assume that the jury's evaluation of Bonar's testimony was based on the passing reference to verification."

A. *Background*

Bonar testified she worked for the San Bernardino County Sheriff's Department in the Scientific Investigations Division, and among other things, performed comparative analyses of bullets and cartridge casings. She testified in detail about her analysis of the four cartridge cases, the four bullets, the firearm, and the ammunition magazine. She concluded with 100 percent certainty that the four cartridges and the four bullets collected in this case were fired from the Ruger pistol found at Scott's home.

16

The prosecutor asked Bonar if another analyst had verified her analysis, and she answered yes. The prosecutor followed up, "Why do you do that and how does it happen?" Bonar replied, "It's our policy when an analyst comes to a conclusion of identification or an elimination on the individual characteristics, a second qualified analyst has to verify the work." The prosecutor asked, "And in this case, your work was verified to be correct?" Defense counsel objected on grounds the question called for "multiple layers of hearsay" and lacked foundation. The court overruled that objection, and Bonar responded, "Yes. Another analyst did verify both the comparisons of the fired bullet and the fired cartridge cases."

In closing argument, the prosecutor stated Bonar was "100 percent positive" and "100 percent sure" that the bullets that killed Stewart had been fired by the gun found in Scott's home.

B. *Applicable Law*

The erroneous admission of testimonial hearsay is reviewed for prejudice under the standard described in *Chapman v. California* (1967) 386 U.S. 18, 24 (*Chapman*). The People must show, beyond a reasonable doubt, that the error did not contribute to the jury's verdict. (*Sanchez, supra,* 63 Cal.4th at p. 698.)

In *Sanchez, supra,* 63 Cal.4th 665, the California Supreme Court held that "[w]hen any expert relates to the jury case-specific out-of-court statements, and treats the content of those statements as true and accurate to support the expert's opinion, the statements are hearsay." (*Id.* at p. 686.)

17

C. *Analysis*

We agree with the People that Bonar's testimony regarding the second analyst's work was not error within the meaning of *Sanchez*; she did not *rely on* case-specific hearsay *to support* her own results and findings. (See *Sanchez*, *supra*, 63 Cal.4th at p. 686.) But we disagree there is no constitutional problem here.

After testifying she concluded the bullets recovered from the victim's body were fired by Scott's gun, Bonar was asked if "in this case, [her] work was *verified to be correct*" by a second analyst. (Italics added.) Over defense counsel's objection, Bonar was permitted to answer the question and testified, "Another analyst did verify both the comparisons of the fired bullet and the fired cartridge cases." Immediately after that answer, in response to the prosecutor's question, "so is there a level of certainty" in your conclusion that the gun fired the expended bullets and casings, Bonar testified, "Yes, I am 100 percent certain." The inference to be drawn is obvious: A second expert had opined the gun fired the recovered bullets and casings.

We conclude the evidence was "testimonial hearsay" admitted against a criminal defendant without any showing of the declarant's unavailability and without any opportunity of cross-examination. This is Sixth Amendment error under *Crawford*. (See *Crawford v. Washington* (2004) 541 U.S. 36, 68 ["Where testimonial evidence is at issue, . . . the *Sixth Amendment* demands what the common law required: unavailability and a prior opportunity for cross-examination"].) Here, the prosecution was essentially permitted to introduce evidence of a second analyst's opinion without cross-examination. Scott had no opportunity to question the second analyst on his or her work,

18

including on his or her expert qualifications, any failure to follow proper procedures, what was the methodology employed, was chain of custody maintained, and so on.

However, analyzing the error under *Chapman*, supra, 386 U.S. 18, as we must, we conclude the error was harmless. As we have discussed, the evidence of Scott's guilt was overwhelming. Specifically, the evidence pointed to a long relationship between Scott and Stewart, and Scott being on the apartment complex's premises in the previous 30 days despite the management's warning that he stay away. Scott threatened to break down Stewart's door if she did not let him in. He called Stewart a witch, and also threatened to kill her. There was gunshot residue on Scott's sandals when he was arrested. The murder weapon was located at his residence. Police obtained and had analyzed the same number of bullets missing from the Ruger were found in this incident and the bullets fired were identified as matching those found in the gun, which had Scott's DNA on it. Scott's whereabouts during the three-hour window when the murder occurred were put in doubt by his ex-girlfriend who visited him during that time but did not find him at home.

### III. *Testimony Ruling Out Certain Suspects*

Scott contends the trial court prejudicially erred in admitting various police officers' testimony that they had investigated and ruled out certain individuals as murder suspects.

A. *Background*

Before trial, defense counsel stated he would rely on third party culpability defense, and pointed to the aide as a possible suspect in the crime.

19

He planned to ask law enforcement witnesses if they investigated other individuals besides Scott. During trial, defense counsel suggested others who should have been investigated for killing Stewart, including the aide; the nurse; Scott's uncle; Scott's ex-girlfriend; Stewart's former roommate; and an individual named Andrew B.

On direct examination, the prosecutor asked San Bernardino County Sheriff's Sergeant Claus Hartleben whether the nurse had been investigated as a possible suspect:

"[PROSECUTOR]: And, now, based on your interview with [the nurse] and also your investigation in this case, did you have any reason to believe, after your investigation, that he may have been responsible for Ms. Stewart's death?

"[DEFENSE COUNSEL]: Objection. Relevance.

"THE COURT: He is the investigator. Overruled.

"[SGT. HARTLEBEN]: Well, we didn't rule anyone out until we conducted our entire investigation. So there was a point during the investigation where we did rule him out after we took some investigative steps."

The prosecutor also asked Sergeant Hartleben whether Andrew B. had been investigated. The sergeant explained that they had investigated Andrew B. because he was in possession of a 1998 pocket calendar that belonged to Stewart. The following colloquy then took place:

"[PROSECUTOR]: Okay. And so did you or other detectives follow up on that?

"[SGT. HARTLEBEN]: Yes, ma'am.

20

"[PROSECUTOR]: And did you or other detectives later make a determination as to whether or not Andrew [B.] was involved?

"[DEFENSE COUNSEL]: Objection. Multiple layers of hearsay.

"THE COURT: Sustained—it's not there yet. You can ask that question. . . . .

"[PROSECUTOR]: And so as part of your investigation, did you take steps to make a determination as to whether or not Andrew [B.] was involved in the murder of Stewart?

"[SGT. HARTLEBEN]: Well, we took steps to rule people out.

"[PROSECUTOR]: Did you do that with—

"[SGT. HARTLEBEN]: With Andrew [B.], yes.

"[PROSECUTOR]: And you said you also did that with [the nurse]?

"[SGT. HARTLEBEN]: Yes."

The prosecutor asked San Bernardino County Sheriff's Sergeant Gary Hart, "And during your investigation—well, as part of your investigation, did you, after interviewing and looking at other evidence, make a determination as to whether or not Andrew [B.] was involved in the murder of Ms. Stewart?" Defense counsel objected on the ground that the question lacked foundation, called for speculation, and contained multiple layers of hearsay. The court sustained the objection.

The prosecutor continued:

"[PROSECUTOR]: Based on your investigation, did you make a determination as to whether Andrew [B.] was involved in this murder?

21

"[SGT. HART]: Based on the evidence at hand, we had no reason to believe that Andrew [B.] was a primary subject of investigation for the homicide."

The prosecutor asked Sergeant Jonathon Cahow if he ruled the aide out as a suspect during his initial investigation. The sergeant said he had not, and he considered the aide a person of interest. The prosecutor then asked, "And so during the course of your investigation, did you make a determination as to whether or not [the aide] was involved in Ms. Stewart's death?" He responded, "I did not believe her to be involved in Ms. Stewart's death."

Finally, the prosecutor asked San Bernardino County Sheriff's Sergeant Charles Phillips if he ruled out Stewart's former roommate as a suspect. The sergeant responded, "Yeah, everyone is a suspect at first until you find evidence to prove that someone else is involved in the murder."

B. *Analysis*

As a general matter, " 'a witness cannot express an opinion concerning the guilt or innocence *of the defendant.*' " (*People v. Torres* (1995) 33 Cal.App.4th 37, 46, italics added.) Although Scott admits he has found no published authority extending this rule to the guilt or innocence *of a third party*, he argues the rule should so extend and would prohibit the testimony of the law enforcement officers challenged here. We need not decide the point to resolve this appeal. After Scott indicated he was going to defend on the ground that the officers had too narrowly focused their investigation on him and failed to consider other potential suspects, the prosecutor was allowed to put on evidence to rebut that anticipated defense. Hence, the witnesses were

22

properly allowed to testify that they had interviewed and gathered evidence on other potential suspects before focusing on Scott. (See *People v. Dryden* (2021) 60 Cal.App.5th 1007, 1027 ["A law enforcement officer's testimony regarding the focus of a criminal investigation is not considered inadmissible lay opinion"].) Although we are concerned the additional testimony that the witnesses had "ruled out" the other suspects may have impermissibly implied the other suspects were not guilty and therefore, by process of elimination, Scott was guilty, we are satisfied any error in allowing that additional testimony was harmless. As we explained earlier, the other evidence of Scott's guilt was overwhelming.

## IV. *Premeditation and Deliberation*

Scott argues the evidence is insufficient to support his first degree murder conviction: "Other than what could be extrapolated from forensic evidence, almost nothing was known about the actual shooting. Assuming, *arguendo*, [Scott] shot Stewart, nothing was known about why he went to her apartment that day, why he brought the gun, what triggered the shooting, how much time passed between the four gunshots, what if anything was said between Stewart and [him] prior to the shooting, etc. Even viewing the evidence in the light most favorable to the judgment and accepting that there had been tension between [him] and Stewart and that [he] had once said he wanted to kill her, those incidents were too ambiguous and distant to constitute substantial evidence that the shooting in February of 2016 was premeditated and deliberated."

23

A. *Applicable Law*

When sufficiency of the evidence is challenged on appeal, we determine whether the record discloses substantial evidence from which, considered as a whole, a reasonable trier of fact could conclude that the crime was committed as charged. (See *People v. Truong* (2017) 10 Cal.App.5th 551, 555-556; accord, *People v. Maciel* (2013) 57 Cal.4th 482, 514-515.) We view the evidence in the light most favorable to the judgment and presume every fact in support of the judgment that the jury could have reasonably deduced from the evidence. (See *Truong,* at p. 556.) Substantial evidence is "evidence that is reasonable, credible and of solid value." (*People v. Kraft* (2000) 23 Cal.4th 978, 1053.) The same standard applies to our review of circumstantial evidence. (See *People v. Ceja* (1993) 4 Cal.4th 1134, 1138.) "The focus of the substantial evidence test is on the *whole* record of evidence presented to the trier of fact, rather than on ' "isolated bits of evidence." ' " (*People v. Cuevas* (1995) 12 Cal.4th 252, 261.) The testimony of a single witness, if believed by the finder of fact, can constitute sufficient evidence. (*People v. Rincon-Pineda* (1975) 14 Cal.3d 864, 885; accord*, Truong,* at p. 556.) When two or more inferences can reasonably be deduced from the facts, we do not substitute our deductions for those of the trier of fact. (*People v. Garcia* (2020) 46 Cal.App.5th 123, 144-145 ["We do not reweigh the evidence or resolve conflicts in the testimony when determining its legal sufficiency"]; accord, *People v. Ceja,* at p. 1139.)

"Murder is the unlawful killing of a human being with malice aforethought. [Citation.] Malice may be either express or implied. Express malice exists when there is a deliberate intention unlawfully to take away

the life of a fellow creature. [Citation.] It is implied when no considerable provocation appears or when the circumstances attending the killing show an abandoned and malignant heart." (*People v. Boatman* (2013) 221 Cal.App.4th 1253, 1263.)

In order for a killing with malice aforethought to be first rather than second degree murder, the intent to kill must be formed on a preexisting reflection and must have been the subject of actual deliberation or forethought. (*People v. Anderson* (1968) 70 Cal.2d 15, 26 (*Anderson*).) A verdict of first degree murder on a theory of willful, deliberate and premeditated killing is proper only if the defendant killed " ' "as a result of careful thought and weighing of considerations; as a *deliberate* judgment or plan, carried on coolly and steadily, [especially] according to a *preconceived design*." ' " (*Ibid*.) " 'Deliberation' refers to careful weighing of considerations in forming a course of action; 'premeditation' means thought over in advance. [Citations.] 'The process of premeditation and deliberation does not require any extended period of time. "The true test is not the duration of time as much as it is the extent of the reflection. Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly." ' " (*People v. Koontz* (2002) 27 Cal.4th 1041, 1080.)

"Whether a defendant possessed the requisite intent to kill is, of course, a question for the trier of fact. While reasonable minds may differ on the resolution of that issue, our sole function is to determine if *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (*People v. Lashley* (1991) 1 Cal.App.4th 938, 946.)

25

" ' "Generally, there are three categories of evidence that are sufficient to sustain a premeditated and deliberate murder: evidence of planning, motive, and method.  [Citations.]  When evidence of all three categories is not present, 'we require either very strong evidence of planning, or some evidence of motive in conjunction with planning or a deliberate manner of killing.'  [Citation.]  But these categories of evidence, borrowed from [*Anderson, supra,* 70 Cal.2d at pp. 26-27], 'are descriptive, not normative.'  [Citation.]  They are simply an 'aid [for] reviewing courts in assessing whether the evidence is supportive of an inference that the killing was the result of preexisting reflection and weighing of considerations rather than mere unconsidered or rash impulse.' " ' " (*People v. Prince* (2007) 40 Cal.4th 1179, 1253.)  If the *Anderson* factors are not present, a finding of premeditation and deliberation can still be upheld based on substantial evidence from which rational jurors could have found that the killing was the result of preexisting thought and the careful weighing of considerations.  (*People v. Boatman, supra,* 221 Cal.App.4th at p. 1270.)

Even if the evidence regarding some of the *Anderson* factors (*Anderson, supra,* 70 Cal.2d 15) is weak, "[i]n reviewing sufficiency of evidence claims, each case of necessity must turn on its own particular facts."  (*People v. Smith* (2005) 37 Cal.4th 733, 745.)  Further, "[e]vidence of all three elements is not essential . . . to sustain a conviction."  (*People v. Edwards* (1991) 54 Cal.3d 787, 813.)  Rather, "[t]hese three categories are merely a framework for appellate review; they need not be present in some special combination or afforded special weight, nor are they exhaustive."  (*People v. Booker* (2011) 51 Cal.4th 141, 173.)

26

B. *Analysis*

The prosecution presented overwhelming evidence from which the jury could find that Scott acted with the intent necessary to sustain the first degree murder charge. Specifically, M.M. testified that approximately three months before the murder, Scott had said he would kill Stewart. Further, although Scott had been warned not to return to the apartment, the jury could infer from the evidence he went there to carry out the murder. That is, that he first retrieved the gun from his father's bedroom, brought it to Stewart's apartment, and fired four shots, killing her. (See *People v. Romero* (2008) 44 Cal.4th 386, 401 [bringing a weapon to location of shooting demonstrated planning activity]; *People v. Villegas* (2001) 92 Cal.App.4th 1217, 1224 [evidence of planning activity included the defendant "carrying a loaded gun with him at the time of the incident"].) After the murder, the gun was hidden under the mattress in the master bedroom, evincing consciousness of guilt.

Scott concedes the manner of killing in this case "supports finding of intent to kill." We agree. Scott shot Stewart, who was elderly, defenseless, and sitting on her couch connected to an oxygen machine, in vulnerable parts of her body, i.e., her head, side chest, and twice in her back. (*People v. Silva* (2001) 25 Cal.4th 345, 369 ["The manner of killing—multiple shotgun wounds inflicted on an unarmed and defenseless victim who posed no threat to defendant—is entirely consistent with premeditated and deliberate murder"].) Moreover, Scott fired from a close range, i.e., at least one shot was fired from just inside the front door while Stewart was sitting on the couch in the living room. (*People v. Halvorsen* (2007) 42 Cal.4th 379, 422 [victims

"were shot in the head or neck from within a few feet, a method of killing sufficiently ' "particular and exacting" ' to permit an inference that defendant was "acting according to a preconceived design"].)  Based on this evidence, a reasonable jury could conclude that Scott killed Stewart with premeditation and deliberation.

## V.  *Prosecutorial Misconduct Claim*

Scott contends that during closing argument, the prosecutor committed misconduct by arguing:  "So before we took a break for lunch, I explained to all of you how the facts of this case can be applied to the law to prove the defendant is guilty of the crime of murder.  [¶]  Now, of course, all of that is premised on the fact that the defendant is the one that [shot] the Ruger pistol and killed Stewart.  That is essentially what you are here for and what is in dispute in this case.  [¶]  *So because if you find that the evidence in case* [sic] *proved beyond a reasonable doubt the defendant is the shooter who shot the Ruger pistol and that Ruger pistol was, in fact, the weapon that the bullet killed* [sic] [*Ms. Stewart*], *then he would be guilty of first degree murder and the allegation would be true.*"  (Italics added.)

It is necessary to place the alleged misconduct in the context of the full argument to establish that no misconduct occurred.  Prior to a lunch break the prosecutor argued:  "Now, we know in this case the gun didn't walk by itself to Ms. Stewart's apartment.  Somebody had to take that gun over to Ms. Stewart's apartment.  And that somebody was [Scott].  Now, not only did he have to take the gun to Ms. Stewart's apartment, he first had to get it from his parent's bedroom.  [¶]  You heard [Scott's father] testify that he always keeps the gun underneath his mattress.  So at some point, [Scott] had to go to

28

his parents' room and to lift the mattress, and to take this gun, and to hide it on him, and we heard that [Scott] didn't have a car. So he had to walk either walk or he skateboarded to Ms. Stewart's apartment with this loaded firearm that's a one-mile distance that we talked about. And now he went to Shirley Stewart's apartment armed. [¶] Why would he need to go to the apartment of the 77-year-old woman who was disabled armed? Because he already had the intent. He already decided he was going to kill her. And then, now, remember [the aide] was there at 10:00, 10:30, and [the nurse] was there at 1:00 o'clock. So he had to make sure that the coast was clear. And he had to make sure nobody was there and he had to wait for Shirley Stewart to be alone in order to carry out this murder. [¶] Specifically, now, [the aide] says she left the door closed and unlocked. So [Scott] in this case would have to open the door, and this is some deliberation and he would have to think about what he was doing at the time. And in this case, when [Scott] shot Ms. Stewart, he chose to use that gun. He chose to bring that gun to her house. He chose to take that gun. He chose to aim it at her and point it at her and he chose to shoot her from at least two feet away, aiming at her head. He hit her once in the head. And he pulled that trigger four times. [¶] Every single time he pulled that trigger, that was a moment of deliberation that he intended to kill her, and it was a moment of premeditation because he knew and he weighed the consequences of that action."

Read together, it is clear the challenged statement has been taken out of context. Defense counsel made no objection to the prosecutor's argument because there was nothing objectionable about it when considered in context.

29

Second, Scott maintains the prosecutor prejudicially misquoted M.M. as saying Scott threatened to kill "that bitch *one day*," when in fact M.M. did not include those last two words. The People concede "the prosecutor technically misquoted [M.M.]," but claim "the prosecutor did not mischaracterize the spirit of what Scott said to [M.M.]. It was reasonable for the prosecutor to infer that Scott meant "one day," in the sense that he did not indicate he was going to kill Stewart immediately." We conclude that this slight misquote was certainly no more prejudicial than the actual quote.

In order to preserve a claim of prosecutorial misconduct for appeal, a defendant must make a timely and specific objection in the trial court and request that the court admonish the jury to disregard the alleged impropriety. (*People v. Powell* (2018) 6 Cal.5th 136, 171.) A defendant is excused from the necessity of objecting and requesting an admonition if such an objection would have been futile. (*People v. Farnam* (2002) 28 Cal.4th 107, 167.)

Scott concedes his trial counsel failed to object to the prosecutor's remarks at trial. Accordingly, he forfeited this claim on appeal.

We also point out the trial court instructed the jury with the legal definitions of premeditation and deliberation, and that if an attorney's statements regarding the law conflicted with the court's instructions, the jury was to follow the court's instructions. In the absence of contrary evidence, we presume the jury followed the court's instructions. (*People v. Krebs* (2019) 8 Cal.5th 265, 335.) We point out the defense counsel's theory of the case, and arguments to the jury, did not focus on a lack of premeditation and

30

deliberation.  Rather, he argued that someone other than Scott killed Stewart.

Accordingly, even if the statement at issue could be construed as error, it was not " ' "so egregious [as to] infect[ ] the trial with such unfairness as to make the conviction a denial of due process" ' " (*People v. Smithey* (1999) 20 Cal.4th 936, 960), nor is there a reasonable likelihood that the jury misconstrued the prosecutor's argument as suggesting it could convict Scott of first degree murder without finding the murder was premeditated and deliberate.  (*People v. Wang* (2020) 46 Cal.App.5th 1055, 1085.)

Scott alternatively argues his trial counsel rendered ineffective assistance by failing to object to the prosecutor's arguments.

To prove counsel provided ineffective assistance, a defendant must show both that counsel's performance fell below an objective standard of reasonableness under prevailing professional norms, and the deficient performance prejudiced him.  (*Strickland v. Washington* (1984) 466 U.S. 668, 687.)  "Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable.  [Citation.]  A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time.  Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct

31

falls within the wide range of reasonable professional assistance." (*Id.* at p. 689.) We accord great deference to counsel's tactical decisions. (*People v. Hinton* (2006) 37 Cal.4th 839, 877, as mod., rehg. den. Apr. 12, 2006.)

"Defendant must also show that if counsel's performance fell below acceptable standards in some respect, a reasonable probability exists that a more favorable outcome would have been reached absent the deficient performance. [Citation.] That probability must be one sufficient to undermine confidence in the outcome of the trial." (*People v. Karis* (1988) 46 Cal.3d 612, 656.) In considering a claim of ineffective assistance of counsel, it is not necessary to determine " 'whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies . . . . If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed.' " (*In re Fields* (1990) 51 Cal.3d 1063, 1079, quoting *Strickland v. Washington, supra,* 466 U.S. at p. 697.)

Because the prosecutor made no improper arguments, defense counsel had no professional obligation to object. (*People v. Anderson* (2001) 25 Cal.4th 543, 587 [defense counsel does not provide ineffective assistance of counsel by declining to lodge a futile objection].) Moreover, as we have concluded the record contains overwhelming evidence of Scott's guilt, his ineffective assistance of counsel claim fails for lack of a showing of prejudice, as this case did not turn on the prosecutor's comments made in passing.

VI. *The Restitution Issue*

The People concede, and we agree, that the court at sentencing, misapprehended its discretion in ordering "a $10,000 victim restitution fund

32

fine as I'm required to do," and that the matter should be remanded so the trial court can exercise its discretion on the matter.

Section 1202.4, subdivision (b), provides that in every case where a defendant is convicted of a crime, the court "shall" impose a restitution fine, unless it finds compelling and extraordinary reasons for not doing so. The fine is required to be no less than $300 and no more than $10,000. A defendant's inability to pay is not a compelling and extraordinary reason for declining to impose a restitution fine. However, inability to pay may be considered in deciding whether to increase the amount of the restitution fine in excess of the minimum. (*Ibid.*)

When imposing the restitution fine, the trial court stated: "The Court is going to make the following findings based on the anticipated sentence. The defendant does not have the ability to reimburse the county for court-appointed counsel fees, investigation costs, and other costs of probation conducting the presentence investigation, and preparation of a probation officer's report. [¶] . . . [¶] *The court does not order the 70 dollar court construction and operations fee because the defendant doesn't have the ability to pay it. The court will order a $10,000 victim restitution fund fine as I'm required to do.* (Italics added.)

Where, as here, a sentence choice is based on an erroneous understanding of the law, the matter must be remanded for an informed determination. (*People v. Downey* (2000) 82 Cal.App.4th 899, 912.) Moreover, in light of the court's other comments regarding restitution, it is reasonably likely the court would have considered imposing a lesser amount if it were aware of its discretion to do so.

33

As this matter is being remanded, we note that after briefing in this case was completed, the California Supreme Court decided *People v. Tirado* (2022) 12 Cal.5th 688 and held that the "statutory framework" of section 12022.53, as amended by Senate Bill No. 620, "permits a court to strike the section 12022.53[, subdivision] (d) enhancement found true by the jury and to impose a lesser uncharged statutory enhancement instead." (*Tirado, supra,* at p. 692.)  On remand, the parties may address the applicability of *Tirado* to this case, if any.

## DISPOSITION

The judgment of conviction is affirmed.  The matter is remanded to the superior court with directions that it reconsider its $10,000 restitution fine imposed on Scott consistent with this opinion.  The trial court may also consider *Tirado, supra*, 12 Cal.5th 688 and whether to exercise its discretion to strike the section 12022.53, subdivision (d) firearm enhancement or to impose a lesser firearm enhancement, as well as any other new sentencing laws applicable to Scott's sentence.

.

O'ROURKE, Acting P. J.

WE CONCUR:


IRION, J.


DO, J.

35